Coads v Nassau County (2024 NY Slip Op 24314)

[*1]

Coads v Nassau County

2024 NY Slip Op 24314

Decided on December 6, 2024

Supreme Court, Nassau County

Marx, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on December 6, 2024
Supreme Court, Nassau County

Hazel Coads; STEPHANIE M. CHASE; MARVIN AMAZAN, et al., Plaintiffs,

against
Nassau County; the NASSAU COUNTY LEGISLATURE; et al., Defendants.
NEW YORK COMMUNITIES FOR CHANGE, MARIA JORDAN AWALOM, et al., Plaintiffs,
against
COUNTY OF NASSAU, THE NASSAU COUNTY LEGISLATURE, et al., Defendants.

Index No. 611872/2023

Plaintiffs:
David L. Mejias, Esq. 
Mejias Milgrim Alvarado & Lindo, P.C. 
1 Dosoris Ln
Glen Cove, NY 11542
(516) 333-7777 
david@mejiaslaw.com
Defendants Nassau County and County Legislature:
Misha Tseytlin, Esq.
Troutman Pepper Hamilton Sanders LLP
227 W Monroe St Ste 3900
Chicago, IL 60606-5085
(202) 549-4835
misha.tseytlin@troutman.com
Nassau County Board of Elections and Joseph J. Kearny:
Matthew M. Rozea, Esq.
Office of the County Attorney
1 West St
Mineola, NY 11502
(516) 571-0709
mrozea@nassaucountyny.gov
James P. Scheuerman:
Ryan Edward Cronin, Esq.
7 2nd Pl
Garden City, NY 11530
(516) 458-3117
ryanecronin@gmail.com
Plaintiffs:
Perry M. Grossman, Esq. New York Civil Liberties Union
125 Broad St
New York, NY 10004-2400
(212) 607-3347
pgrossman@nyclu.org
Michael G. Scavelli, Esq.
Steptoe LLP
1114 Avenue of the Americas
New York, NY 10036
(212) 378-7538
mscavelli&commat;steptoe.com
Adriel I. Cepeda Derieux, Esq.
American Civil Liberties Union
915 15th St NW
Washington, DC 10005
(202) 457-0800
ACepedaDerieux@aclu.org
Defendants Nassau County and County Legislature
Bruce Blakeman, Michael C. Pulitzer, Howard J. Kopel:
Misha Tseytlin, Esq.
Troutman Pepper Hamilton Sanders LLP
227 W Monroe St Ste 3900
Chicago, IL 60606-5085
(202) 549-4835
misha.tseytlin@troutman.com
Nassau County Board of Elections and Joseph J. Kearny:
Matthew M. Rozea, Esq.
Office of the County Attorney
1 West St
Mineola, NY 11502
(516) 571-0709
mrozea@nassaucountyny.gov
James P. Scheuerman:
Ryan Edward Cronin, Esq.
7 2nd Pl
Garden City, NY 11530
(516) 458-3117
ryanecronin@;gmail.com

Paul I. Marx, J.

The papers filed electronically on NYSCEF in Hazel Coads, et al. v Nassau County, et al., Index No. 611872/2023 ("Action #1"), numbered 150-224 and 227, on the motion of Defendants Nassau County ("County") and the Nassau County Legislature ("Legislature") (collectively, "Defendants") seeking summary judgment and such other relief as this Court deems just and proper (Motion #7); and in New York Communities for Change, et al. v County of Nassau, et al., Index No. 602316/2024 ("Action #2"), numbered 255-329 and 332, on the motion of Defendants County, Legislature, Bruce Blakeman, in his official capacity as County Executive, Michael C. Pulitzer, in his official capacity as Clerk of the Legislature, and Howard J. Kopel, in his official capacity as Presiding Officer of the Legislature (collectively, "Defendants") seeking summary judgment and such other relief as this Court deems just and proper (Motion #15), were read and considered in connection with the consolidated motions.[FN1]

Upon reading the foregoing papers, it is hereby ORDERED that the consolidated motions are disposed as follows.
BACKGROUND
These Actions both challenge the County's 2023 Legislative Redistricting Map which became effective on February 28, 2023 (the "2023 Map"), primarily on different grounds. There is an overlapping claim of partisan gerrymandering in violation of Section 34 of the New York State Municipal Home Rule Law ("Home Rule Law"), which is brought in both Actions.[FN2]

Plaintiffs in Action #1 ("Coads Plaintiffs") principally challenge the 2023 Map as partisan gerrymandering in violation of Section 34 of the Home Rule Law. The Coads Plaintiffs allege that the redistricting process which led to adoption of the 2023 Map was tainted because it was "highly partisan" and "largely excluded" the Democratic minority from participation in the process. See, e.g. Coads Complaint, NYSCEF # 1, ¶¶ 52, 65, 68, 74. The Coads Plaintiffs allege that the 2023 Map "favors the Republican Party and disfavors the Democratic Party by 'packing' Democratic-leaning voters into Districts 2 and 3 and by 'cracking' Democratic-leaning concentrations across Districts 10, 14, and 18 so as to dilute their voting strength." Coads Complaint at ¶ 71. The Coads Plaintiffs allege that the 2023 Map "also favors the Republican Party and disfavors the Democratic Party by pairing two Democratic incumbents and no Republican incumbents." Id. at ¶ 72. The Coads Plaintiffs allege that the 2023 Map "favors the Republican Party and disfavors the Democratic Party by moving the Democratic minority leader from a solidly-Democratic district to a Republican-leaning district." Id. at ¶ 73. Plaintiffs allege that "[a] comparison of the 2023 [Map] to an ensemble of 10,000 computer-drawn maps designed to comply with the requirements of the . . . Home Rule Law reveals that the 2023 [Map] is an extreme partisan gerrymander that fails the Harkenrider [v Hochul, 38 NY3d 494 (2022)] test." Id. at ¶ 74. The Coads Plaintiffs allege that the 2023 Map "projects a loss of two Democratic seats compared to a party-blind map." Id. The Coads Plaintiffs also contend that the [*2]prior 2013 redistricting map — "'the last lawfully enacted map — is now malapportioned in violation of the one-person-one-vote principle of Article 1, Section 11 of the New York State Constitution and Section 34 of the Home Rule Law." Id. at ¶ 76.
Plaintiffs in Action #2 ("NYCC Plaintiffs") allege that the 2023 Map was drawn with the intent to dilute the votes of Black, Latino, and Asian voters within the County, thereby constituting racial gerrymandering in violation of the John R. Lewis Voting Rights Act of New York ("NYVRA"), codified under New York Election Law § 17-206, and Section 34 of the Home Rule Law. The NYCC Plaintiffs allege that the 2023 Map "discriminates against the County's Black, Latino, and Asian voters . . . [because it] unnecessarily 'cracks' and 'packs' Nassau County's communities of color, suppressing their ability to exercise political power and have a representative governing body." NYCC Complaint at 1, NYSCEF Doc # 2. NYCC Plaintiffs allege that a legally compliant redistricting map "would have included six districts, of nineteen total, where eligible Black, Latino, and Asian voters constituted a majority of the population ... [instead of] only four such districts." Id. NYCC Plaintiffs allege further that "[t]he 2023 [Map] also gratuitously cracks a large, compact Asian community in western Nassau County into three districts, denying those voters any opportunity to influence the outcome of elections." Id. The NYCC Plaintiffs also allege a claim of partisan gerrymandering in violation of Section 34 of the Home Rule Law.
During the legislative redistricting process at issue, Richard Nicolello, the then Presiding Officer of the Legislature ("Presiding Officer" or "Nicolello"), was presented with two proposed redistricting maps by the Temporary Redistricting Advisory Commission ("TDAC"), one drawn by the Republican Commissioners and the other drawn by the Democratic Commissioners. The TDAC was created by the Legislature to "recommend one or more plans to the county Legislature for dividing the county into legislative districts for the election of county legislators". Nassau County Charter, § 113(2). Neither map was formally submitted by the TDAC, as it is required to "take all action by not less than six affirmative votes of its members", which were not obtained. Id. at § 113(3).
The Presiding Officer rejected the maps and hired the law firm Troutman Pepper Hamilton Sanders LLP ("Troutman Pepper"), in November 2022, to help draw a new map which complied with all applicable legal requirements. Troutman Pepper worked closely with a redistricting expert, Dr. Sean P. Trende ("Trende"), to redraw the legislative map for the County. On February 9, 2023, Nicolello released his proposed redistricting map. The redrawn map was thereafter considered at a public hearing of the County Legislature on February 16, 2023, where Nicolello released a memorandum prepared by Troutman Pepper supporting its legal bona fides. Misha Tseytlin, Esq. of Troutman Pepper testified at the public hearing about the proposed redistricting map, summarizing the memorandum explaining how the redrawn map complied with applicable constitutional and statutory law, and Trende's opinions.
At the February 16, 2023, public hearing, the Presiding Officer received feedback from the other legislators and the public. The Democratic legislators voiced several concerns and requested certain revisions to the map. In addition, the Democratic Minority Leader called Dr. Daniel Magleby, who testified that the proposed map was too partisan. The Presiding Officer considered the Democratic legislators' requests and revised the proposed map to attempt to incorporate some of the requests that were made.
On February 27, 2023, Nicolello released a revised version of his map, along with another supporting memorandum from Troutman Pepper. On the same date, the Legislature [*3]adopted the final iteration of the map on strict party lines through Local Law 1, which was signed into law on February 28, 2023. Certain legislators contested the validity of the 2023 Map, as enacted, and threatened litigation to challenge it. These Actions by non-legislators followed.
Plaintiffs in both Actions seek an order declaring the 2023 Map void and enjoining its use for future elections. The Coads Plaintiffs further seek a declaration that the 2013 map is malapportioned due to population changes in the County. The Plaintiffs in both actions request that the Legislature be directed to adopt a new redistricting map that complies with the Home Rule Law and the NYVRA.[FN3]
All Plaintiffs seek an award of reasonable attorneys' fees and costs and disbursements pursuant to Election Law § 17-218.
DISCUSSION
Although the subject motion is consolidated and addresses claims in both Actions, the issues break down such that resolution of the Section 34 partisan gerrymandering claim resolves all issues in Action #1, but only partially disposes of the Section 34 claims made in Action #2. Defendants did not address the Section 34 claim alleged in Action #2. While the disposition of the partisan gerrymandering claim in Action #1 will determine the same claim in Action #2, Defendants made no arguments concerning the Section 34 racial gerrymandering claim in Action #2.[FN4]
Therefore, Action #2 will proceed to trial on that claim regardless of the outcome of the motion.
Resolution of the NYVRA claim affects only Action #2, as there is no NYVRA claim alleged in Action #1.
Standard of Review
A party moving for summary judgment pursuant to CPLR §3212 must make out a prima facie case that it is entitled to judgment as a matter of law by tendering evidentiary proof in admissible form sufficient to show that there are no triable issues of material fact and that judgment should be directed in its favor. Voss v Netherlands Ins. Co., 22 NY3d 728, 734 [2014] (citing Alvarez v Prospect Hosp., 68 NY2d 320 [1986]); Giuffrida v Citibank Corp., 100 NY2d 72 [2003]; Englington Med., P.C. v Motor Vehicle Acc. Indem. Corp., 81 AD3d 223, 230 [2nd Dept 2011]). Only upon the movant satisfying its initial burden, will the burden then shift to the respondent to rebut such showing by adducing evidence that creates a triable issue of material fact. Voss, supra at 734.
In reviewing a motion for summary judgment, the court must give respondent "the benefit of every favorable inference that may be drawn from the pleadings, affidavits, and competing contentions of the parties." Nicklas v Tedlen Realty Corp., 305 AD2d 385, 386 [2nd Dept 2003] (citing Myers v Fir Cab Corp., 64 NY2d 806 [1985]). Summary judgment may not be granted "where questions of fact or credibility are raised that require a trial." Id. (citing Zuckerman v City of New York, 49 NY2d 557 [1980]; Glick & Dolleck v Tri—Pac Export Corp., 22 NY2d 439 [1968]).
Defendants' Motion for Summary Judgment on the Coads

 Plaintiffs' NY Home Rule § 34(4)(e) Partisan Gerrymandering Claim in Action #1
Section 34 of the Home Rule Law establishes limitations and requirements for the creation of election districts such as the legislative districts which form the subject of this action. Home Rule Law § 34(4)(e) provides:
Districts shall not be drawn to discourage competition or for the purpose of favoring or disfavoring incumbents or other particular candidates or political parties. The maintenance of cores of existing districts, of pre-existing political subdivisions including cities, villages, and towns, and of communities of interest shall also be considered. To the extent practicable, no villages, cities, or towns except those having more than forty percent of a full ratio for each district shall be divided.
Plaintiffs contend that the map adopted by the legislature is the product of partisan gerrymandering in that it favors the majority Republican Party and disfavors the minority Democratic Party. As such, they assert, the 2023 Map violates Home Rule Law § 34. Plaintiffs assert that the minority Democratic legislators were largely excluded from the development of the map because simultaneously with presenting the TDAC maps for consideration, the Presiding Officer embarked on his own course, having his counsel and its selected expert develop another map. Plaintiffs contend that the minority was blindsided with a map that was presented to them at the last minute. This approach, Plaintiffs bemoan, was designed to, and did, exclude the Democratic members of the legislature from meaningful participation in violation of Home Rule Law § 34.
Relying on People v Dominique, 90 NY2d 880 [1997], Defendants assert that there are no material questions of fact to defeat their motion because the "presumption of regularity" anticipates that an elected official will not act contrary to his/her/their official duty and "substantial evidence is necessary to overcome that presumption." Id. at 881. Defendants also point to Harkenrider v Hochul, supra, to defend against Plaintiffs' partisan gerrymandering claim.
Because Harkenrider held that the State legislature engaged in partisan gerrymandering which required a new congressional district map to be drawn, Defendants highlight what they contend are significant differences in the circumstances attendant to each case. They argue that unlike Harkenrider, where there was no minority participation in the drawing of the congressional district map, here the minority party was invited to, and did, participate in the adoption of the map enacted into law. Defendants assert that during the instant redistricting process various maps were considered, discussed, and acted on. They assert that the 2023 Map which was ultimately adopted satisfied the "partisan fairness metrics" used in Harkenrider as analyzed by the same expert, Trende, whose map was adopted there. Defendants also rely on the fact that upon presentation of the proposed map to the county legislators, the Presiding Officer [*4]adopted four of what they contend were the only five suggestions made by the Democrats. This, they argue, significantly distinguishes the instant matter from Harkenrider, where there was no opportunity to participate by the minority Republican Party. Thus, Defendants conclude, "no reasonable factfinder could conclude that the Legislature engaged in partisan gerrymandering, in violation of NY Mun. Home Rule Law § 34(4)(e), especially given the presumption of regularity". Defendants' Memorandum of Law ("Defendants' MOL") p 4 (citing Dominque, supra at 881).
Plaintiffs respond, highlighting certain circumstances surrounding the adoption of the 2023 Map which they contend create material questions of fact, especially regarding intent, which require a trial. Plaintiffs contend that the 2023 Map was intended to favor the majority party.
Plaintiffs contend that the determination of a party's intent is "fact intensive involving the determination of witness credibility and weighing of hotly disputed facts." Plaintiffs' Memorandum of Law in Opposition ("Plaintiffs' Opposition") p 7. Plaintiffs submit that in Harkenrider, the appellate court instructed that "no level of intentional discouragement of competition or partisan favoritism" can be tolerated. Id. (citing Harkenrider, 204 AD3d at 1370). Plaintiffs submit that the evidence supports partisan intent as demonstrated through the exclusion of the minority party and evidence of discriminatory impact. Plaintiffs argue that the evidence that the map was largely the product of a one-party process compels a determination, to be made by the trier of fact, that the map was the result of impermissible partisan intent. Plaintiffs note that the 2023 Map which was adopted received zero votes from the minority Democratic legislators after "a process that excluded [them] from any participation in the map drawing while denying them even basic information about the mapdrawing process." Finally, Plaintiffs assert that the evidence supports a conclusion that the map was intended to favor the Republican majority.
Plaintiffs highlight that Nicolello waited until February 9, 2023 to release the map which he proposed should replace the two-party maps which he rejected, and then waited until February 16, 2023 (12 days prior to the commencement of the petitioning process), to justify this new "race-blind" map. They contend that the procedure employed reveals the partisanship behind the adoption process. Plaintiffs assert that Nicolello's decision to reject the maps proposed by the two TDAC factions was preordained as he intended all along to submit his own map. Plaintiffs complain that they were not given any justification for Nicolello's new map until "five minutes" before the February 16, 2023, meeting, when they were presented for the first time with Troutman Pepper's memorandum. This, they contend, was made manifestly worse by the refusal of Nicolello to permit Tseytlin and Trende to answer questions about the creation of the map when it was presented for consideration. Plaintiffs submit that an exchange between Nicolello and Democratic Legislator Carrie Solages (set forth below) exemplifies the extent to which the minority was barred from seeking information on which the map was being proffered.
Plaintiffs assert that the map drawing process was "so one sided" that the Democratic Legislators had to repeatedly ask who, in fact, drew the map. Tseytlin testified during the hearing that he and Troutman Pepper drew the map. NYSCEF Doc # 259 at p 54. Since then, Tseytlin has disavowed drawing the map, stating that Trende drew it.
In reply to Plaintiffs' opposition, Defendants submit that "Plaintiffs have not presented the 'substantial evidence' necessary to overcome the 'presumption of regularity' such that a factfinder could conclude that defendants engaged in partisan gerrymandering". Defendants' [*5]Memorandum of Law in Reply ("Defendants' Reply MOL") p 5. Instead, Defendants argue, "a single legislator — Presiding Officer Nicolello— presented maps for his colleagues' consideration and incorporated numerous changes requested by Democratic legislators." Id. Defendants assert that Nicolello "relayed" to his colleagues that the proposed Local Law comported with the Harkenrider analysis as conducted by Trende and therefore, warranted adoption. In addition, Defendants dispute Plaintiffs' assertion that the 2023 Map represents partisan gerrymandering. They argue that Plaintiffs' contention that the Local Law was enacted without any consultation is "contrary to the undisputed evidence". Id.
While ultimately Plaintiffs would bear the burden at trial of establishing beyond a reasonable doubt that the 2023 Map was the product of intentional gerrymandering, to defeat this motion for summary judgment, Plaintiffs need only establish that there is a material question of fact rendering this matter trial worthy. The burden identified by the Court of Appeals in Harkenrider is a heavy one at trial and bears mentioning:
In this case, petitioners asserted that, along with being procedurally flawed, the 2022 congressional map enacted by the legislature violates the constitutional provision prohibiting partisan gerrymandering. To prevail on such claim, petitioners bore the burden of proving beyond a reasonable doubt that the congressional districts were drawn with a particular impermissible intent or motive — that is, to "discourage competition" or to "favor or disfavor incumbents or other particular candidates or political parties" (NY Const, art III, § 4 [c] [5]). Such invidious intent could be demonstrated directly or circumstantially through proof of a partisan process excluding participation by the minority party and evidence of discriminatory results (i.e., lines that impactfully and unduly favor or disfavor a political party or reduce competition). (Harkenrider, 38 NY3d at 519).
However, the Court is not presented with a trial burden at this time. Rather, the Court is presented with a motion for summary judgment which carries a different burden. That burden is substantially lighter. "It is fundamental that 'summary judgment should only be granted where there are no material and triable issues of fact' . . . and that 'issue finding, as opposed to issue determination, is the key to summary judgment'." Paulin v Needham, 28 AD3d 531, 531 [2nd Dept 2006] (internal citations omitted).
Plaintiffs assert that Nicolello intended to institute a map which favored the majority party. They note that not a single Democratic legislator voted for the adopted map. This is significant because, they emphasize, "a largely one-sided process used to enact" a challenged redistricting plan can establish impermissible partisan intent. Harkenrider, 38 NY3d at 519-520. As stated above, in Harkenrider, the Court of Appeals held that intent of impermissible gerrymandering can be demonstrated "directly or circumstantially through proof of a partisan process excluding participation by the minority party and evidence of discriminatory results." Id. at 519.
Here, Plaintiffs look to the circumstances under which the map was presented and discussed by the legislators to identify partisan intent. Significantly, as Plaintiffs argue, simultaneously with the discussion of the proposed maps by the Legislature, Tsetylin, and Trende had already begun drafting a new map. During that later discussion of the new map, Nicolello refused to allow Tseytlin to testify to the underpinnings of the proffered map, leading to the exchange between Legislator Solages and Nicolello below.
The exchange between Nicolello and Solages is troubling to say the least and goes a long way to creating the material question of fact required to defeat the instant motion. The exchange, re-stated at paragraph 102 of the NYCC Complaint, occurred between Solages and Nicolello while Tseytlin was testifying at the hearing:
LEGISLATOR SOLAGES: So, you're not providing the analysis from Mr. Trende?
MR. TSEYTLIN: I am providing his bottom-line conclusion. That is what I'm providing. LEGISLATOR SOLAGES: Can you please provide his analysis?
PRESIDING OFFICER NICOLELLO: I think he's answered the question. He's providing the bottom-line analysis, and that's —
LEGISLATOR SOLAGES: He's relying upon the conclusion, but not upon the analysis. But the analysis determines the conclusion; therefore, we are entitled to the analysis. PRESIDING OFFICER NICOLELLO: Therefore, no, you're not. He's given you an answer, and that's the answer that you have.
LEGISLATOR SOLAGES: There was no answer, just to be clear.
PRESIDING OFFICER NICOLELLO: He was. He basically said that he's providing a bottom-line analysis and that's all that he is providing.
LEGISLATOR SOLAGES: He's refusing to provide an analysis that he [is] relying on the conclusion that came from that analysis.
PRESIDING OFFICER NICOLELLO: It is what it is.
Defendants expect this Court to overlook the outright denial by Nicolello of relevant information requested by Solages from Tseytlin, to accept "it is what it is" as adequate explanation for the map, and to endorse a map that was rammed through without adequate discussion of those facts. That, alone, is sufficient for the Court to conclude that a question of fact exists with respect to the majority's intent. Clearly, a legislative map implemented and expected to survive a decade should be the product of free and open discussion based on a fully developed record, not simply a "bottom line" analysis of Trende's evaluation provided by Tseytlin.
The refusal by Tsetylin and Trende to answer questions posed by a Democratic legislator at the hearing compels this Court to conclude that a more robust evaluation of the circumstances leading to the adoption of the map is required.
The Court recognizes that Defendants argue that the minority party was not excluded from participation because they claim that Nicolello acquiesced in four of the claimed five modifications requested by the minority party. This argument ignores, however, the reality that the minority was not included in the development of the proposed map in the first instance. Agreeing to incorporate changes requested by the minority into a map designed in secret is simply not the same as including the minority in the planning stages of the map.[FN5]

Curiously, Defendants appear to argue in their Reply papers that the majority cannot be faulted for the manner in which the 2023 Map was adopted because "the undisputed evidence shows that one legislator, Nicolello, proposed his own map for all of his colleagues' consideration" and "there is no evidence that Nicolello, [a Republican] gave [those] memoranda to any legislator — Republican or Democrat — in advance of the memoranda's public release." [*6]Defendants' Reply MOL p6. While this argument is superficially attractive, to adopt this as evidence of nonpartisanship, one must assume that Nicolello charted his own course without regard to party membership or influence. However, the fact remains that Nicolello was a Republican legislator with deep roots to that party. To accept that Nicolello's politics played no part in the development of the map created at his direction would require the Court to accept that he was able to completely divorce himself from any party considerations. Likewise, Defendants' argument that Nicolello was not partisan because he engaged a national law firm with experience in map drawing, is unpersuasive. If Nicolello was truly acting independently and free of partisan interest or influence one would have expected him to favor full disclosure and debate by permitting Tseytlin to explain the justifications for the map when asked by Legislator Solages.
Further, the record before this Court reveals that there are conflicting expert opinions as to whether the 2023 Map unfairly favors the majority over the minority and whether that perceived favoritism was intentional. And, of course, the experts disagree on the veracity of their methodology and outcomes. Compare, e.g. reports of Daniel B. Magleby, PhD, Jonathan Cervas, Sean P. Trende, PhD. Interestingly, each side suggests that the others' expert opinions support their contentions.
The law is clear that where there are conflicting expert opinions submitted on a motion for summary judgment, the motion must be denied. See e.g. Pezulich v Grecco, 206 AD3d 827 [2nd Dept 2022] (an analogous case where the Court held that "[s]ummary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions" since "[s]uch conflicting expert opinions will raise credibility issues which can only be resolved by a jury" (internal citations omitted)).
Defendants contention that the process was not partisan because Dr. Magleby's opinions were before the Legislature during the adoption process fails to dispute the partisan nature of the process and the proposed map.

Defendants' Motion for Summary Judgment on the NYCC Plaintiffs' NYVRA Claim in Action #2
In Action #2, Defendants mount a constitutional challenge to the NYVRA, contending that the statute is unconstitutional on its face.[FN6]
 Defendants assert that the Court must apply strict scrutiny to determine whether the NYVRA violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Relying upon Students for Fair Admissions, Inc. v President & Fellows of Harvard College ("SFFA"), 600 US 181 [2023], and Parents Involved in Comty. Schs. v Seattle Sch. Dist. No. 1, 551 US 701 [2007], Defendants claim that strict scrutiny is the applicable standard of review because the NYVRA uses a "racial-classification scheme" that distributes benefits and imposes burdens based upon individual racial classifications. Defendants' MOL at pp11-12. Specifically, Defendants contend that the NYVRA [*7]"directs" that a political subdivision using a district-based election system must draw districts that group voters together "based solely upon their racial identity" to allow candidates favored by members of one race to be elected more often than candidates favored by some other race. Defendants assert that, unlike Section 2 of the VRA, which "is the rare law that satisfies strict scrutiny", the NYVRA cannot satisfy strict scrutiny. Defendants' MOL at p12. Defendants contend that the NYVRA is unconstitutional because it "explicitly rejects many of the safeguards of Section 2 of the VRA", meaning that it does not meet the requirements established by the Supreme Court in Thornburg v Gingles, 478 U.S. 30 [1986]. Defendants' MOL at p14.
Plaintiffs counter Defendants' arguments, asserting that neither the VRA nor the NYVRA "'says nor implies that persons are to be treated differently on account of their race'." Plaintiffs' Opposition at pp14-15 (quoting Crawford v Bd. of Educ. of L.A., 458 US 527, 537 [1982]). Plaintiffs assert that the NYVRA, like the VRA, is race conscious but does not use racial classifications to allocate benefits and burdens to any individual. Plaintiffs point out that both statutes protect voters of all races. Plaintiffs assert that courts have applied rational basis review to the VRA and to state voting rights laws that contain "nearly identical provisions" to the VRA. They distinguish the cases cited by Defendants on the ground that they plainly involved assignments and presumptions being conferred on members of specific racial groups. By contrast, the VRA and the NYVRA seek to provide an equal opportunity to all voters regardless of their race to have their vote count. Plaintiffs rely on California and Washington state court decisions in Sanchez v City of Modesto, 145 Cal App 4th 660, 51 Cal Rptr 3d 821 [2006], cert denied 552 US 974 [2007]; and Portugal v Franklin County, 530 P3d 994, 1012 [Wash 2023], cert denied 144 S Ct 1343 [2024], which rejected similar challenges to the voting rights laws of their states. Plaintiffs assert that the United States Supreme Court's ("Supreme Court") decision in Students for Fair Admissions, Inc. v President & Fellows of Harvard College ("SFFA"), supra, does not require a different outcome. Plaintiffs contend that affirmative action and voting rights are fundamentally different, principally because racial proportionality in districting is not an inevitable remedy for inequitable voting opportunity. Plaintiffs' Opposition at p17. Plaintiffs assert that Defendants have not shown that the NYVRA is unconstitutional on its face, because they have not shown that there is no circumstance under which it could be constitutionally applied.
When a statute is challenged as being unconstitutional on its face, a court must "examine the words of the statute on a cold page and without reference to" how it is applied. People v Stuart, 100 NY2d 412, 421 [2003]. The party pursuing a facial challenge carries the "'heavy burden' of showing that the statute is impermissibly vague in all of its applications." Id. (citing United States v Salerno, 481 US 739, 745 [1987]; Village of Hoffman Estates v Flipside, Hoffman Estates, Inc., 455 US 489, 494—495, 497, [1982]; see also Matter of Wood v Irving, 85 NY2d 238, 250 [1995] (Levine, J., dissenting); McGowan v Burstein, 71 NY2d 729, 733 [1988]). To succeed on such a challenge, the challenger must show "that the law is "'invalid in toto—and therefore incapable of any valid application'." Ibid. (citing Hoffman Estates, 455 US at 495, n 5, quoting Steffel v Thompson, 415 US 452, 474 [1974]; see Tribe, American Constitutional Law § 12—32, at 1036 [2nd ed 1988]). "[F]acial challenges to statutes are generally disfavored (see e.g. National Endowment for the Arts v Finley, 524 US 569, 580 [1998]), and legislative enactments carry a strong presumption of constitutionality (see Brady v. State of New York, 80 NY2d 596, 602 [1992]; People v Bright, 71 NY2d 376, 382 [1988]) . . . ". People v Stuart, supra at 422.
In Washington State Grange v Washington State Republican Party ("Grange"), 552 US [*8]442 [2008], the Supreme Court explained the reasons why facial challenges are disfavored. First, the Supreme Court asserted that "[c]laims of facial invalidity often rest on speculation [and thereby] raise the risk of 'premature interpretation of statutes on the basis of factually barebones records'." Grange, 552 US at 450-51 (quoting Sabri v United States, 541 US 600, 609 [2004]). Such challenges "also run contrary to the fundamental principle of judicial restraint" which provides that questions of constitutional law should not be anticipated by courts "'in advance of the necessity of deciding [them]'" and courts should not "'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied'." Id. (quoting Ashwander v TVA, 297 US 288, 346—347 [1936] (Brandeis, J., concurring) (internal citation omitted)). Furthermore, facial challenges are discouraged because they "threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution." Id. As the Supreme Court stated, courts must be mindful that "'[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people'." Ibid. (quoting Ayotte v Planned Parenthood of Northern New Eng., 546 US 320, 329 [2006] (internal citation omitted)).
Defendants focus on the NYVRA's definition of "protected class", homing in on the term "race" and arguing that by recognizing the existence of race, it constitutes a racial classification that violates the Equal Protection Clause. The term does not, of itself, connote any racial group or preference. As discussed below, the same term is used in Section 2 of the VRA in the same manner, and it has repeatedly been upheld by the Supreme Court. See, e.g., Allen v Milligan, 599 US 1 [2023] (collected cases).
Section 2 of the VRA
The stated purpose of Section 2 of the VRA is to provide an equal opportunity to all members of the electorate to participate in the electoral process and to elect their preferred representatives. The NYVRA states the same purpose. Both the VRA and the NYVRA refer explicitly to race or color.[FN7]

Section 2 of the VRA prohibits "denial or abridgment" of the right of any citizen to vote "on account of race or color, or [membership in a language minority group]" 52 USC § 10301(a) (emphasis added). Section 2(a) of the VRA states that:
No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 10303(f)(2) of this title [membership in a language minority group], as provided in subsection (b). (52 U.S.C. § 10301(a))
Subsection (b) describes how a violation of the statute is established:
(b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens ... in that its members have less opportunity than other members of the electorate [*9]to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population. (52 U.S.C. § 10301(b))
Subsection (b) expressly states that the electoral process must be "equally open to participation by members of a class of citizens", who cannot be given "less opportunity than other members of the electorate . . . to elect representatives of their choice."
Over the course of its jurisprudence interpreting Section 2 of the VRA, the Supreme Court has carefully examined the reference to race [FN8]
in the statute, what it means, and the kind of consideration it requires. Most recently, in Allen v Milligan, supra, the Supreme Court brought to bear all the strands of that jurisprudence to definitively explain what race means as it relates to the VRA, and specifically, in the context of districting. Notably, the Supreme Court reiterated that "Section 2 itself 'demands consideration of race'." Allen v Milligan, 599 US at 30-31 (quoting Abbott v Perez, 585 US 579, 587 [2018]) (emphasis added). And, as the Supreme Court expressly stated, "'race consciousness does not lead inevitably to impermissible race discrimination'." Id. at 31 (quoting Shaw v Reno, 509 US 630, 646 [1993]). Section 2 of the VRA has not been subjected to a facial challenge nor required to pass strict scrutiny.
New York Voting Rights Act
The NYVRA also seeks to protect all voters from racial discrimination in voting and to provide greater protections beyond what is offered by the VRA. "There is no rule that a state legislature can never extend civil rights beyond what Congress has provided." Sanchez v City of Modesto, 145 Cal. App. 4th at 687—88. Defendants have not argued that the NYVRA is preempted by the VRA. The NYVRA does not conflict with the VRA because it does not provide remedies that are prohibited by the federal law.
The NYVRA specifically prohibits voter suppression and vote dilution. NY Election Law §17-206(1) and (2).
The NYVRA, Election Law §17-206(1) (a), which prohibits voter suppression, states that
[n]o voting qualification, prerequisite to voting, law, ordinance, standard, practice, procedure, regulation, or policy shall be enacted or implemented by any board of elections or political subdivision in a manner that results in a denial or abridgement of the right of members of a protected class to vote.
Subsection (2)(a), which prohibits vote dilution, states that
[n]o board of elections or political subdivision shall use any method of election, having the effect of impairing the ability of members of a protected class to elect candidates of their choice or influence the outcome of elections, as a result of vote dilution.
The NYVRA defines "protected class" as "a class of individuals who are members of a race, color, or language-minority group". NY Election Law §17-204(5). Language-minority group is defined as "persons who are American Indian, Asian American, Alaskan Natives or of Spanish heritage." NY Election Law §17-204(5-a). The definition of "protected class" in the NYVRA, as "a class of individuals who are members of a race [or] color" is no different than the language used in Section 2 of the VRA, which has not been subjected to strict scrutiny and which the Supreme Court recently held is constitutional. See Allen v Milligan, supra at 41.
Strict Scrutiny is Not Applicable
Narrowing their focus to districting,[FN9]
Defendants claim that the NYVRA requires a political subdivision "to group residents by race and draw district lines or otherwise change their election system" to increase the electoral success of racial minority groups. Defendants rely on cases such as Parents Involved in Comty. Schs. v Seattle Sch. Dist. No.1, supra, and Students for Fair Admissions, Inc. v President & Fellows of Harvard Coll., supra, seeking to equate the NYVRA to affirmative action programs which have been subject to strict scrutiny. This is a false equivalence and a misguided approach.[FN10]

Affirmative action laws and policies provide an inapt analogy to the NYVRA, because, unlike the NYVRA, such laws and policies confer a specific benefit upon an individual or racial group solely or predominately based upon the race of the individual. The NYVRA does not do that. The NYVRA does not confer benefits upon any individual and it does not guarantee successful outcomes to any individual or group. Instead, it seeks to provide equal opportunity in voting. The fact that it can be applied in a discriminatory manner does not mean that the NYVRA is constitutionally infirm. If a districting law draws districts based predominantly on race and only secondarily based upon non-racial factors like contiguity, the application of the law will be constitutionally suspect and strict scrutiny will be used to review the allegedly discriminatory application of the law. The NYVRA is not an affirmative action statute; it does not identify any race upon which any preference is conferred.
Section 17-206(2)(b) of the NYVRA sets forth the manner for asserting a violation of the vote dilution provision of the statute, based upon the type of election method used by a political subdivision — at-large or district-based or alternative method. That section reads:
(i) used an at-large method of election and either: (A) voting patterns of members of the protected class within the political subdivision are racially polarized; or (B) under the totality of the circumstances, the ability of members of the protected class to elect candidates of their choice or influence the outcome of elections is impaired; or
(ii) used a district-based or alternative method of election and that candidates or electoral choices preferred by members of the protected class would usually be defeated, and either: (A) voting patterns of members of the protected class within the political [*10]subdivision are racially polarized; or (B) under the totality of the circumstances,[FN11]the ability of members of the protected class to elect candidates of their choice or influence the outcome of elections is impaired. (Election Law 17-206(2)(b))
Defendants' citation to NYVRA Section 17-206(2)(c)(iv) does not support their contention that the statute requires a political subdivision to group their citizens by racial groups to draw electoral districts. Section 17-206(2)(c)(iv) states that "where there is evidence that more than one protected class of eligible voters are politically cohesive in the political subdivision, members of each of those protected classes may be combined." Defendants misconstrue the provision as a districting directive, but it is not related to drawing district lines. It exists within a subsection of the NYVRA which merely sets forth how "evidence shall be weighed and considered" in demonstrating a vote dilution claim. None of the provisions of Section 17-206(2)(c) mandate what a political subdivision must do when drawing district lines. None of the provisions of Section 17-206(2)(c) prescribe remedies or direct political subdivisions to create electoral districts or redress a violation of the statute.
Section 17-206(2)(c) lays out how evidence of a vote dilution claim "shall be weighed and considered", providing that
(i) elections conducted prior to the filing of an action pursuant to this subdivision are more probative than elections conducted after the filing of the action; (ii) evidence concerning elections for members of the governing body of the political subdivision are more probative than evidence concerning other elections; (iii) statistical evidence is more probative than non-statistical evidence; (iv) where there is evidence that more than one protected class of eligible voters are politically cohesive in the political subdivision, members of each of those protected classes may be combined; (v) evidence concerning the intent on the part of the voters, elected officials, or the political subdivision to discriminate against a protected class is not required; (vi) evidence that voting patterns and election outcomes could be explained by factors other than racially polarized voting, including but not limited to partisanship, shall not be considered; (vii) evidence that sub-groups within a protected class have different voting patterns shall not be considered; (viii) evidence concerning whether members of a protected class are geographically compact or concentrated shall not be considered, but may be a factor in determining an appropriate remedy; and (ix) evidence concerning projected changes in population or demographics shall not be considered, but may be a factor, in determining an appropriate remedy.
Section 16-206(5) of the NYVRA provides a lengthy list of possible remedies, none of which are mandated, and none require using race as a sole or predominant factor. Subsection (5) provides that after finding a violation, a court may implement remedies to ensure equitable access from a non-exhaustive list:
(i) a district-based method of election;
(ii) an alternative method of election;
(iii) new or revised districting or redistricting plans;
(iv) elimination of staggered elections so that all members of the governing body are elected on the same date;
(v) reasonably increasing the size of the governing body;
(vi) moving the dates of regular elections to be concurrent with the primary or general election dates for state, county, or city office as established in section eight of article three or section eight of article thirteen of the constitution, unless the budget in such political subdivision is subject to direct voter approval pursuant to part two of article five or article forty-one of the education law;
(vii) transferring authority for conducting the political subdivision's elections to the board of elections for the county in which the political subdivision is located;
(viii) additional voting hours or days;
(ix) additional polling locations;
(x) additional means of voting such as voting by mail;
(xi) ordering of special elections;
(xii) requiring expanded opportunities for voter registration;
(xiii) requiring additional voter education;
(xiv) modifying the election calendar;
(xv) the restoration or addition of persons to registration lists; or
(xvi) retaining jurisdiction for such period of time on a given matter as the court may deem appropriate, during which no redistricting plan shall be enforced unless and until the court finds that such plan does not have the purpose of diluting the right to vote on the basis of protected class membership, or in contravention of the voting guarantees set forth in this title, except that the court's finding shall not bar a subsequent action to enjoin enforcement of such redistricting plan.
Defendants do not point to any language in the NYVRA that supports their contention that a political subdivision using a district-based method of election must draw districts that group voters together based solely (or predominantly) upon their race, which is required to trigger strict scrutiny. Defendants' MOL at 15 (emphasis added). None of the potential remedies provided in the NYVRA require a political subdivision to use race as the sole or predominant factor in determining which remedy is appropriate or in fashioning any remedy. Race is not even mentioned.
The Supreme Court has expressly stated that "[s]trict scrutiny does not apply merely because redistricting is performed with consciousness of race." Bush v Vera, 517 US 952, 958—59 [1996] (citing Shaw v Reno, supra, 509 US at 646). The Supreme Court explained in Allen v Milligan how race may be considered:
When it comes to considering race in the context of districting, we have made clear that there is a difference "between being aware of racial considerations and being motivated by them." Miller [v Johnson], 515 US 900, 916; see also North Carolina v Covington, 585 US 969, 976 [2018] (per curiam). The former is permissible; the latter is usually not. That is because "[r]edistricting legislatures will ... almost always be aware of racial demographics," Miller, 515 U.S. at 916, but such "race consciousness does not lead inevitably to impermissible race discrimination," Shaw, 509 U.S. at 646. Section 2 itself [*11]"demands consideration of race." Abbott v Perez, 581 US , 138 SCt at 2315. The question whether additional majority-minority districts can be drawn, after all, involves a "quintessentially race-conscious calculus." [Johnson v] De Grandy, 512 US 997, 1020 [1994]. (Allen v Milligan, 599 US at 30-31) (emphasis added).
Indeed, mapmakers are not required to be "entirely'blind' to race . . . The line that [the Supreme Court has] long drawn is between consciousness and predominance." Allen v Milligan, 599 US at 33. Race predominates "in the drawing of district lines . . . when 'race-neutral considerations [come] into play only after the race-based decision had been made'." Id. at 31 (quoting Bethune-Hill v Virginia State Bd. of Elections, 580 US 178, 189 [2017]). "[R]ace may not be 'the predominant factor in drawing district lines unless [there is] a compelling reason'." Id. (quoting Cooper v Harris, 581 US 285, 291 [2017]). While "the line between racial predominance and racial consciousness can be difficult to discern . . . race for its own sake [cannot be] the overriding reason for choosing one map over others." Ibid. (internal citations omitted).
The NYVRA does not require district lines to be drawn based upon race; nor specify how such lines are to be drawn. It is a voting rights act, not a districting law. Defendants have provided no basis for their contention that the NYVRA requires using "race for its own sake, and no other districting principles". Miller v Johnson, 515 US at 913. On its face, the NYVRA requires equal opportunity in electoral systems; it does not require race-based preference to confer a privilege upon a group of voters.[FN12]
 In fact, the NYVRA does not confer a privilege upon any group. "Whether one potential remedy under a statute would be subject to strict scrutiny if imposed is not the test for facial invalidity of the statute." Sanchez v City of Modesto, 145 Cal. App. 4th at 688—89. While a districting plan that uses race as the predominant line-drawing factor would be subject to strict scrutiny, "this potential problem is not a basis for a facial challenge." Id. at 683. Defendants have not shown that only unconstitutional remedies are mandated by the NYVRA; therefore, their facial challenge fails.
Defendants have not overcome the strong presumption of constitutionality that attaches to legislative enactments such as the NYVRA. The NYVRA passes rational basis review, because it meets a legitimate government interest to ensure equal opportunity in voting and confers on any citizen the right to challenge an election system believed to violate it.
Thornburg v Gingles Preconditions
Defendants seem to argue that the NYVRA is constitutionally infirm because it does not require the three preconditions for establishing a vote dilution claim set forth in Thornburg v Gingles, 478 US 30, 48 [1986]. The Supreme Court established the Gingles preconditions to ensure that a remedy could be fashioned to redress a vote dilution claim under the VRA.
Gingles considered a challenge by a group of black voters to North Carolina's legislative redistricting plan, claiming that their ability to elect a representative of their choice was impaired in seven districts (one single member and six multimember districts) in violation of the Fourteenth and Fifteenth Amendments to the United States Constitution and Section 2 of the [*12]VRA. Specifically, the claim of vote dilution asserted by the plaintiffs was that in multimember districts their votes were submerged by the rest of the electorate, such that their ability to elect their preferred candidate was minimized or canceled out. "The theoretical basis for this type of impairment is that where minority and majority voters consistently prefer different candidates, the majority, by virtue of its numerical superiority, will regularly defeat the choices of minority voters." Gingles, 478 US at 48.
The Supreme Court addressed this type of claim by crafting three preconditions that a plaintiff must satisfy to show that multimember districts operate to impair the ability of minority voters to elect representatives of their choice. "First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." Id. The Court explained that without that showing, the group could not fault the multi-member form of the district as the reason for its inability to elect its candidates if the group lacked the potential to elect their preferred representative in a single-member district. The Court explained that the group's impact in a single-member district was "generally the appropriate standard against which to measure minority group potential to elect because it is the smallest political unit from which representatives are elected." Id. at 50 n 17. "Second, the minority group must be able to show that it is politically cohesive. . . . Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it—in the absence of special circumstances, such as the minority candidate running unopposed, usually to defeat the minority's preferred candidate." Id. at 51 (internal citations omitted). The Court added that "the usual predictability of the majority's success distinguishes structural dilution from the mere loss of an occasional election." Ibid. "[F]inally, the totality of circumstances inquiry recognizes that application of the Gingles factors is 'peculiarly dependent upon the facts of each case'." 478 US at 79. Before courts can find a violation of Section 2, therefore, they must conduct "an intensely local appraisal" of the electoral mechanism at issue, as well as a "searching practical evaluation of the past and present reality." Allen v Milligan, 599 US at 19 (quoting Gingles, 478 US at 79).
The fact that the NYVRA does not require all three Gingles preconditions does not render the statute unconstitutional or invalid. The first precondition is not required for a claim under the NYVRA,[FN13]
because the statute is not limited to vote dilution; it also addresses influence districts. As the Supreme Court stated in Voinovich v Quilter, 507 US 146, 158 [1993], "the Gingles factors cannot be applied mechanically and without regard to the nature of the claim." As an example, "the first Gingles precondition, the requirement that the group be sufficiently large to constitute a majority in a single district, would have to be modified or eliminated when analyzing the influence-dilution claim we assume, arguendo, to be actionable today." Id. (internal citation omitted). As the Supreme Court further explained, "[t]he complaint in such a case is not that black voters have been deprived of the ability to constitute a majority, but of the possibility of being a sufficiently large minority to elect their candidate of choice with [*13]the assistance of cross-over votes from the white majority." Voinovich, 507 US at 158 (internal citation omitted); see also Bartlett v Strickland, 556 US 1, 23-24 [2009] ("Our holding that [Section] 2 does not require crossover districts does not consider the permissibility of such districts as a matter of legislative choice or discretion. . . . States that wish to draw crossover districts are free to do so where no other prohibition exists."); League of United Latin Am. Citizens v Perry, 548 US 399, 430 [2006] (" LULAC") ("To be sure, [Section] 2 of the VRA does not forbid the creation of a noncompact majority-minority district.").
The Court declines to consider whether all three Gingles preconditions have been met by Plaintiffs because there is no authority for superimposing any of the preconditions that are not already written into the statute. Arguably, the requirement of showing racially polarized voting merges the second and third Gingles preconditions—political cohesiveness and that the majority group votes as a bloc, and the NYVRA expressly requires a showing that the choice of the protected group "would usually be defeated".
Defendants Claim that Even if the NYVRA is Constitutional, Plaintiffs Cannot Satisfy the "Usually Be Defeated" Requirement
Defendants argue that even if the Court determines that the NYVRA is constitutional, they are entitled to summary judgment because Plaintiffs have not shown that "any of their identified minority groups' preferred candidate will 'usually be defeated' in Nassau County. Defendants concede that "'the evidence is very strong that voting in Nassau County is racially polarized'." Defendants' MOL at p26 (citing Oskooii Dep at 135:9-11). Thus, Defendants focus on whether Plaintiffs can meet the requirement to show that a minority group's preferred candidate will "usually be defeated", claiming that they cannot satisfy it. Defendants ask the Court to interpret "usually defeated" to require Plaintiffs to show that the group's preferred candidate "will be routinely defeated in elections across the entire jurisdiction [Nassau County], not in hand-picked areas of the [County] . . . ". Defendants' MOL at p22. Defendants argue that Plaintiffs must show that the minority preferred candidates "routinely lose a significant majority of elections across Nassau." Defendants' Reply MOL at p13. Defendants assert that if the Court accepts their definition of "usually defeated" to mean that the minority candidate will lose a significant majority of elections across the County, there is no issue of fact because the evidence shows that minority preferred candidates are "capable" of winning and do so "regularly".
Plaintiffs argue that determining whether a minority group's preferred candidate is usually defeated is a fact-intensive inquiry that raises numerous material issues of fact and law. Plaintiffs assert that Defendants' experts should not have given equal weight to every election they analyzed, without considering whether they were "recent or more distant", were held in odd or even numbered years, involved an incumbent, or candidates of different races, or other special circumstance. Plaintiffs assert that determining whether the minority group's candidate is usually defeated is more than adding up columns of numbers.
Plaintiffs argue that they are not required to show that a minority group's preferred candidate will usually be defeated "across the entire relevant jurisdiction". They contend that the NYVRA's district-based provisions employ the kind of localized approach that is appropriate to vote dilution claims. Plaintiffs cite Allen v Milligan, supra, to show that an expert can look at voters in impacted areas. Plaintiffs' Opposition at p 29. They cite De Grandy, supra, and Reno v Shaw, supra, which state that the rights of minority voters in one area cannot be used to trade against those of minority voters in another area of the relevant jurisdiction. Id. Plaintiffs assert that their expert Dr. Cervas demonstrated that vote dilution can be remedied by respecting [*14]traditional districting principles and without "robbing Peter to pay Paul".
While the NYVRA requirement that a district-based vote dilution claim must show "that candidates or electoral choices preferred by members of the protected class would usually be defeated" mirrors the third Gingles pre-condition, federal law does not provide a clear definition on what "usually defeated" means and the showing required to meet it.
In Gingles, the Supreme Court stated that "the extent of bloc voting necessary to demonstrate that a minority's ability to elect its preferred representatives is impaired varies according to several factual circumstances, the degree of bloc voting which constitutes the threshold of legal significance will vary from district to district." 478 US at 55. The Supreme Court stated that "in general, a white bloc vote that normally will defeat the combined strength of minority support plus white 'crossover' votes rises to the level of legally significant white bloc voting." Id. at 56. Further, the Court stated that the ability of black voters to elect their representative of choice "will vary from district to district according to a number of factors, including the nature of the allegedly dilutive electoral mechanism; the presence or absence of other potentially dilutive electoral devices, such as majority vote requirements, designated posts, and prohibitions against bullet voting; the percentage of registered voters in the district who are members of the minority group; [and] the size of the district[.]" Id. Moreover, "a pattern of racial bloc voting that extends over a period of time is more probative" because it indicates the "loss of political power through vote dilution" rather than "the mere inability to win a particular election". Id. at 57. As the Court concluded, "there is no simple doctrinal test for the existence of legally significant racial bloc voting." Id. at 57-58.
Courts largely continue to agree with Gingles on this point, holding that the legal significance of racial bloc voting depends on the factual circumstances and must be based upon a practical, commonsense examination of all the evidence. See, e.g., Pope v County of Albany, 687 F3d 565, 578 [2nd Cir 2012]; Vecinos De Barrio Uno v City of Holyoke, 72 F3d 973, 984, 989 [1st Cir. 1995]; Yumori-Kaku v City of Santa Clara, 59 Cal App 5th 385, 411—16 [2020].
This Court agrees. The legal issue of what "usually defeated" means under the NYVRA requires assessing the factual circumstances and resolving disputed issues of material fact and law which must await a trial. Plaintiffs claim of vote dilution in the district-based election system used in the County is that it was brought about through manipulating district lines to split up a group of voters across multiple districts to ensure that they do not form a majority in any district or concentrating a group of voters into only a few districts where they can win only those districts but not ultimately influence the outcome of an election. In the first instance, the parties disagree whether the entire County should be considered rather than focusing on the area(s) Plaintiffs claim were impacted. The parties' experts disagree on the appropriate methodology, beginning with what elections are probative. There are too many material factual issues which preclude granting summary judgment on this record.
CONCLUSION
It is hereby ORDERED that Defendants' motion for summary judgment is denied in its entirety.
The foregoing shall constitute the Decision and Order of the Court.
Dated: December 6, 2024
White Plains, New York
E N T E R
HON. PAUL I. MARX, J.S.C.

Footnotes

Footnote 1:The motion papers filed in Actions ##1 and 2 are identical, and they address the claims in both actions. Consequently, the Court will issue a single Decision and Order which disposes of the motions in both Actions.

Footnote 2:Action #2 also alleges a claim of racial gerrymandering in violation of Section 34 of the Home Rule Law. Action #1 does not allege any claims related to racial gerrymandering.

Footnote 3:The NYCC Plaintiffs seek appointment of "a Special Master to evaluate potential remedial plans and recommend to the Court a remedial plan for implementation without deferring to remedies proposed by Defendants, consistent with Election Law § 17-206[5][b]". NYCC Complaint at ¶ 34.

Footnote 4:Plaintiffs note that Defendants did not move for summary judgment on the Municipal Home Rule gerrymandering claims in Action #2. In their Reply papers, Defendants assert that a separate application for that relief in Action #2 was unnecessary because, if summary judgment is granted to Defendants in Action #1, that would be law of the case applicable to Action #2. This is only partially correct as Plaintiffs in Action #2 also raise a claim of racial gerrymandering, a claim not raised in Action #1. 

Footnote 5:This is exactly what the TDAC, a bi-partisan commission, is designed to prevent.

Footnote 6:Defendants assert that Plaintiffs do not argue that they meet the requirements for establishing a claim of voter dilution under Section 2 of the federal Voting Rights Act ("VRA"), 52 USC §10301, therefore, "the Court need not decide whether the NYVRA would be constitutional as applied to a situation where it was just requiring what the VRA requires." Defendants' MOL at pp14-15 (internal citations omitted). In their opposition, Plaintiffs argue in the alternative that they meet the requirements for a claim under Section 2 of the VRA.

Footnote 7:Both statutes also refer specifically to language minority group, but the discussion here is limited to race because that is the focus of the parties' arguments.

Footnote 8:Race has been the focus, to the exclusion of color (an amorphous term) and language minority group. It is worth noting that race and color are non-exclusive. By contrast, the word "minority" modifies only language groups and specifies certain languages which arguably define particular groups.

Footnote 9:Arguably, Defendants defeat or severely undermine their facial challenge, which must show that the NYVRA is unconstitutional in toto.

Footnote 10:Where there are such clear guidelines set by the Supreme Court as to how race may be considered in districting, there is absolutely no need, and no justification, to reach for affirmative action cases.

Footnote 11:Subsection (3) provides what factors may be considered under the totality of the circumstances, which are similar to the factors considered under a Gingles analysis of a claim under Section 2 of the VRA.

Footnote 12:The Court disagrees with the contrary finding of the court in Clarke v Town of Newburgh, Index No. EF002460-2024 [Sup Ct, Orange County November 7, 2024], and the court's determination which follows from that premise.

Footnote 13:
Subsection (c)(viii) of the NYVRA expressly states that "evidence concerning whether members of a protected class are geographically compact or concentrated shall not be considered but may be a factor in determining an appropriate remedy".