OPINION OF THE COURT
Garcia, J.
The New York City Police Department (NYPD) does not administer physical coordination tests when a language barrier prevents the administering officer from communicating the test instructions to a non-English speaking suspect. Defendant Jose Aviles challenges this policy, arguing that his equal protection and due process rights were violated because he was denied a coordination test on the basis of a language barrier. We disagree, and hold that the order of the Appellate Term should be affirmed.
*501 L
Factual Background
Defendant was arrested after striking a marked New York City police vehicle that was entering traffic with its emergency lights on. According to the arresting officer, defendant had “a strong odor of alcohol on his breath,” “slurred speech,” and was “swaying and unsteady on his feet.” At the scene of the accident, defendant made the following statement to the arresting officer: “I had a few Coronas about 15 minutes ago, about 3 Coronas.”
After he was arrested, defendant was brought to an Intoxicated Driver Testing Unit (IDTU), where he consented to a breathalyzer test. The test, which was administered nearly three hours after the accident, resulted in a blood-alcohol content reading of .06—a reading below the .08 minimum required for a per se violation (Vehicle and Traffic Law § 1192 [2]). Defendant was not given a physical coordination test. Instead, the IDTU Technician Test Report contains a handwritten line crossing out the “Coordination Test” portion of the report, as well as a handwritten entry that reads: “No coord test given,” and “Language Barrier.” Defendant was ultimately charged with driving while impaired and driving while intoxicated (Vehicle and Traffic Law § 1192 [1], [3]).
Defendant moved to dismiss the misdemeanor information on the ground that the NYPD violated his rights under the Equal Protection and Due Process Clauses of the Federal and State Constitutions by failing to offer a physical coordination test on the basis of a language barrier. Specifically, defendant argued that, “while an English-speaking person arrested for driving under the influence of alcohol would ordinarily receive” a coordination test, defendant “was summarily denied this opportunity because of the language he speaks.”[1] The People opposed, contending that defendant was not denied equal protection, and that defendant’s due process rights were not implicated by the NYPD’s decision not to offer a coordination test based on defendant’s inability to speak or understand English.
*502 Criminal Court granted defendant’s motion, holding that the “failure to provide the defendant—merely because he speaks only Spanish—with access to . . . potentially exculpatory evidence is a denial of his constitutional rights warranting dismissal.” Specifically, the court determined that “the failure to administer the coordination test in this case constitutes a denial of due process and equal protection” under both the United States Constitution and the New York State Constitution. The Appellate Term reversed, holding that a similar constitutional challenge had recently been rejected by the Appellate Division (People v Aviles, 47 Misc 3d 126[A], 2015 NY Slip Op 50347[U] [App Term, 1st Dept 2015], citing People v Salazar, 112 AD3d 5 [1st Dept 2013]).
A Judge of this Court granted defendant leave to appeal (25 NY3d 1198 [2015]). We affirm.
hH ¡I—I
Equal Protection
Pursuant to the Fourteenth Amendment of the United States Constitution, “[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws” (US Const, Amend XIV, § 1). The New York Constitution provides for equivalent equal protection safeguards (NY Const, art I, § 11; see Hernandez v Robles, 7 NY3d 338, 362 [2006]).
Alleged equal protection violations are primarily evaluated using either a “strict scrutiny” or a “rational basis” standard of review. Where governmental action disadvantages a suspect class or burdens a fundamental right, the conduct must be subjected to “strict scrutiny,” and will be upheld only if the government can establish a compelling justification for the action (Regents of Univ. of Cal. v Bakke, 438 US 265, 299-300 [1978]). While “facially neutral conduct can constitute discrimination” against a suspect class in violation of equal protection, such a claim “requires that a plaintiff show an intent to discriminate against the suspect class” (Soberal-Perez v Heckler, 717 F2d 36, 41-42 [2d Cir 1983]). Where a suspect class or fundamental right is not implicated, the government action need only be rationally related to a legitimate governmental purpose (id. at 41).
Here, defendant’s equal protection claim is premised on the notion that the NYPD’s policy of offering physical coordination tests only in English amounts to intentional discrimina *503 tion on the basis of ethnicity or national origin. But strict scrutiny is inapplicable to defendant’s claim, as he has not demonstrated that the challenged policy singles out members of a suspect class, nor has he shown intentional discrimination. While Hispanics as an ethnic group constitute a suspect class (Keyes v School Dist. No. 1, Denver, 413 US 189, 197 [1973]), the NYPD policy at issue is facially neutral and is not based on race, ethnicity, or national origin. Rather, the policy is based solely on a suspect’s ability to speak and understand English, which, by itself, does not implicate a suspect class (Soberal-Perez, 717 F2d at 41). Nor has defendant demonstrated intentional discrimination based on his ethnicity. To the contrary, the record demonstrates that the officer’s decision not to conduct a coordination test was based solely on a determination that a language barrier—not defendant’s ethnicity— prevented the officer from administering the test.
The dissent contends that, where language “serve[s] as a proxy for national origin, ethnicity, and race,” a defendant could establish intentional discrimination against a suspect class sufficient to invoke strict scrutiny (dissenting op at 509-511). We agree. To be sure, upholding the facial validity of the NYPD policy does not preclude all challenges to the policy as applied to a particular defendant where, for instance, the defendant was denied a coordination test on the basis of his ethnicity, as opposed to any language barrier. But that is not the case before us. The instant case presents no evidence of such intentional discrimination or other similarly compelling circumstances. Nor is there any indication that defendant’s language was “treated as a surrogate” for his ethnicity or was a mere “pretext for racial discrimination” (Hernandez v New York, 500 US 352, 371-372 [1991]). Rather, defendant has consistently maintained that, as a non-English speaker, he “was summarily denied this opportunity because of the language he speaks” (emphasis added). The record supports the notion that the decision not to administer a coordination test was a purely language-based determination—not a determination based on race, ethnicity, or national origin. Accordingly, rational basis review, rather than strict scrutiny, applies to defendant’s equal protection claim.
The challenged policy withstands rational basis review. Both the NYPD and the public have a substantial interest in ensuring the reliability of coordination tests, and the clarity of *504 the instructions is crucial to the reliability of the results. Indeed, the record makes clear that coordination tests are designed not only to assess a suspect’s “motor skills in completing the specific tasks,” but also to evaluate the suspect’s “capacity to . . . follow instructions.” But coordination tests are uniquely ill-suited for administration via translation; they are generally lengthy—containing 30 lines of instructions—and require contemporaneous demonstration and explanation of the tasks to be performed. The translation of instructions, cannot be delegated to a translator, as the administering officer must have the requisite training and experience, and must be able to understand the translated instructions in order to accurately analyze the suspect’s responses. Moreover, given the time-sensitive nature of coordination tests, requiring an administering officer to seek out an appropriately trained translator could result in a delay that affects the results (see Missouri v McNeely, 569 US —, —, 133 S Ct 1552, 1560 [2013] [noting that, “as a result of the human body’s natural metabolic processes, the alcohol level in a person’s blood begins to dissipate once the alcohol is fully absorbed and continues to decline until the alcohol is eliminated”]). Indeed, the value of physical coordination tests diminishes with the passage of time, and test results eventually become entirely meaningless where they follow a prolonged delay. Nor can instructions “simply be recited through a video tape,” as the tests require “specific clarity in instructions and interaction.” The NYPD policy therefore rationally furthers the goals of avoiding delayed or erroneous results due to a language barrier.
In addition, the NYPD undoubtedly has a substantial interest in avoiding the heavy financial and administrative burdens of employing translation services or multilingual officers qualified to administer coordination tests in the myriad languages spoken in this state. According to the record, New York State residents speak 168 distinct languages and countless dialects. Requiring the administration of translated instructions to all intoxicated driving suspects statewide would impose an exorbitant cost that would have a “crippling impact” on the State, as detailed in the record. The dissent’s contention that “the NYPD has language access protocols in place and resources available to address the needs of New York City’s linguistically diverse communities” (dissenting op at 507) is unsupported by the record and ignores the realities of physical coordination tests, which require precise instructions and *505 prompt administration.[2] Nor does the dissent identify which particular languages are “most often in demand” such that translation services should be required (dissenting op at 513).
Each of the rationales established by the purportedly “thin” record (dissenting op at 512 n 5) independently supplies a legitimate government interest that is furthered by the NYPD policy. Of course, “New York City’s commitment to access to justice regardless of language status” is a laudable and worthy goal (dissenting op at 507). And the City’s “recognition of the needs of its diverse communities” is undoubtedly embodied in the various executive branch letters, reports, and policies cited by the dissent (dissenting op at 510-512). But we do not measure constitutional violations against these policies, nor do they somehow give rise to an equal protection violation. Under our established constitutional analysis, we conclude that the challenged NYPD policy is rationally related to a number of legitimate governmental purposes.[3]
Accordingly, because the NYPD policy withstands rational basis review, defendant’s equal protection claim must be rejected.
h-H I—I I—I
Due Process
Under the United States Constitution, “[n]o person shall be . . . deprived of life, liberty, or property, without due process of law” (US Const Amend V). The New York Constitution provides for similar protections (NY Const, art I, § 6) and “[w]e have at times found our Due Process Clause to be more protective of rights than its federal counterpart” (Hernandez, 7 NY3d at 362). Due process is, of course, a flexible concept that calls for such procedural protections as the particular situation demands (Mathews v Eldridge, 424 US 319, 334 [1976]). “Determining whether additional process is due in any *506 particular proceeding requires balancing the interests of the State against the individual interest sought to be protected” (People v Ramos, 85 NY2d 678, 684 [1995], citing Mathews, 424 US at 334).
Defendant contends that the NYPD’s failure to offer him a coordination test based on a language barrier violated his due process rights under the federal and state constitutions. However, as an initial matter, the police have no duty to assist a defendant in gathering evidence or establishing a defense (People v Finnegan, 85 NY2d 53, 58 [1995]). Nor does a defendant have a right to have the police perform a certain investigative step simply because it may yield information that is helpful to him (Arizona v Youngblood, 488 US 51, 58-59 [1988]; People v Hayes, 17 NY3d 46, 51-52 [2011]). And, while defendants have a constitutional due process right to a qualified interpreter during judicial proceedings (People v Ramos, 26 NY2d 272, 274 [1970]), the same right is not implicated during the pre-arrest investigation of suspected intoxicated driving; the administration of coordination tests—a discretionary, investigative technique designed to gather evidence of intoxication—is not a judicial, quasi-judicial, or administrative proceeding.
In any event, as discussed above, the implicated state interests are substantial. The State has a clear interest in avoiding the cumbersome and prohibitively expensive administrative and fiscal burdens of providing the requested translation services. The State also has a strong interest in ensuring the accuracy of physical coordination tests, and the use of translated instructions—either through qualified interpreters or through multilingual officers—could compromise the test’s reliability. Given the substantial state interests involved, defendant’s due process claim must be rejected.
IV
Accordingly, the order of the Appellate Term should be affirmed.

. The dissent’s discussion of persons who are “limited English proficient” or “LEP” was not raised before the trial court and, in any event, is inapplicable to this case. The trial court found—and defendant has consistently maintained—that he “speaks only Spanish, and not English.”

. The dissent exempts defendant from the preservation rule and opts to “take judicial notice” of “publicly-available documents” in order to bolster arguments that defendant asserts for the first time on appeal (dissenting op at 512 n 5). We decline to do the same.

. The dissent limits its analysis to the context of New York City. But our constitutional pronouncements apply statewide, including to areas with dramatically different resources, law enforcement practices, populations, and “linguistic needs” (dissenting op at 513 n 7). The dissent’s analysis would call into question investigatory tools employed by law enforcement statewide.