Clarke v Town of Newburgh (2025 NY Slip Op 00518)

Clarke v Town of Newburgh

2025 NY Slip Op 00518

Decided on January 30, 2025

Appellate Division, Second Department

Lasalle, P.J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on January 30, 2025
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

HECTOR D. LASALLE, P.J.
CHERYL E. CHAMBERS
JANICE A. TAYLOR
DONNA-MARIE E. GOLIA, JJ.

2024-11753
 (Index No. 2460/24)

[*1]Oral Clarke, et al., plaintiffs-appellants,
v
Town of Newburgh, et al., respondents; Letitia James, etc., intervenor-appellant.

APPEALS, in an action pursuant to Election Law § 17-206, from an order of the Supreme Court (Maria S. Vazquez-Doles, J.), dated November 7, 2024, and entered in Orange County. The order granted the defendants' motion for summary judgment dismissing the complaint and directed that the John R. Lewis Voting Rights Act of New York was stricken in its entirety from further enforcement and application to the defendants and to any other political subdivision in New York State.

Abrams Fensterman, LLP, White Plains, NY (Robert A. Spolzino, Jeffrey A. Cohen, David Imamura, Steven Still, and Election Law Clinic at Harvard Law School [Ruth Greenwood, Nicholas O. Stephanopoulos, Daniel Hessel, and Samuel Jacob Davis, pro hac vice], of counsel), for plaintiffs-appellants.
Letitia James, Attorney General, New York, NY (Barbara D. Underwood, Judith Vale, Andrea Trento, Beezly J. Kiernan, Sandra Park, Lindsay McKenzie, and Derek Borchardt of counsel), intervenor-appellant pro se.
Troutman Pepper Hamilton Sanders LLP, New York, NY (Misha Tseytlin and Bennet J. Moskowitz of counsel), for respondents.
Campaign Legal Center, Washington, DC (Robert Brent Ferguson of counsel), amicus curiae pro se and for amici curiae American Civil Liberties Union of Southern California and American Civil Liberties Union of Northern California.
NAACP Legal Defense & Educational Fund, Inc., New York, NY (Adam Lioz, Samuel Spital, Stuart Naifeh, Michael Pernick, and Maia Cole of counsel), amicus curiae pro se.
Baker & Hostetler, LLP, New York, NY (Ariana Dindiyal, Robert J. Tucker, Erika D. Prouty, Rebecca Schrote, and E. Mark Braden of counsel), for amici curiae Town of Mount Pleasant and Town Board of the Town of Mount Pleasant.
Holtzman Vogel Baran Torchinsky & Josefiak, PLLC, Buffalo, NY (Joseph Burns of counsel), for amicus curiae Town of Cheektowaga.

LASALLE, P.J.

OPINION & ORDER
I. Introduction
In addition to setting out the powers of the branches of our government, the [*2]constitutions of the United States and New York State contain provisions protecting the rights of minorities from the "tyranny of the majority" (John Adams, A Defence of the Constitutions of Government of the United States of America, Vol. 3, 291 [1788]; see also James Madison, Federalist No. 10), including provisions guaranteeing citizens equal protection of the laws (see US Const, 14th Am, § 1; NY Const, art I, § 11). On this appeal we are asked to decide whether the vote dilution provisions of the John R. Lewis Voting Rights Act of New York (L 2022, ch 226; hereinafter NYVRA), intended to ensure that a numerical minority's voice is not removed from local government, facially violate the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (hereinafter the Equal Protection Clause)[FN1]. The defendants in this case, the Town of Newburgh and the Town Board of the Town of Newburgh (hereinafter the Town Board), lack the capacity to challenge the constitutionality of the NYVRA except to the extent that it forces them to violate the Equal Protection Clause. Since, on this record, the defendants failed to show as a matter of law that compliance with the NYVRA would force them to violate the Equal Protection Clause, we reverse the order of the Supreme Court.
II. The Federal Voting Rights Act
Sixty years ago, Congress enacted the Voting Rights Act of 1965 (hereinafter the FVRA), pursuant to its authority to enforce the Fifteenth Amendment to the United States Constitution (see Allen v Milligan, 599 US 1, 41). Section 5 of the FVRA, which initially was set to expire after five years, provided that no change in voting procedures in certain jurisdictions defined by a "coverage formula" set out in section 4 of the FVRA could take effect until it was approved by the United States Attorney General or a court of three judges (Shelby County v Holder, 570 US 529, 537-538). Although these sections of the FVRA were repeatedly reauthorized by Congress, in 2013, the United States Supreme Court struck down section 4 because the coverage formula was based on data that was more than 40 years old and no longer responsive to current needs and thus an impermissible burden on the principles of federalism and the equal sovereignty among the states (see id. at 535, 543-544, 550-557). Accordingly, section 5 has been rendered unenforceable until Congress drafts a new coverage formula, which it has not done (see id. at 557).
However, section 2 of the FVRA, which applies throughout the United States and concerns vote dilution, remains in effect (see id.). "In its original form, § 2 closely tracked the language of the [Fifteenth] Amendment and, as a result, had little independent force. [The] leading case on § 2 at the time was City of Mobile v Bolden [(446 US 55)], which involved a claim by black voters that the City's at-large election system effectively excluded them from participating in the election of city commissioners. The commission had three seats, black voters comprised one-third of the City's population, but no black-preferred candidate had ever won election" (Allen v Milligan, 599 US at 10-11 [citations, footnote, and internal quotation marks omitted]). The Court in City of Mobile ruled against the plaintiffs, concluding that the Fifteenth Amendment, and thus section 2, did not "prohibit laws that [were] discriminatory only in effect" (id. at 11; see City of Mobile v Bolden, 446 US at 61-65).
"Almost immediately after it was decided, Mobile produced an avalanche of criticism, both in the media and within the civil rights community" (Allen v Milligan, 599 US at 11 [internal quotation marks omitted]). "By focusing on discriminatory intent and ignoring disparate effect, critics argued, the Court had abrogated the standard used by the courts to determine whether [racial] discrimination existed" (id. at 12 [internal quotation marks omitted]). On the other hand, "mandating racial proportionality in elections was regarded by many as intolerable" (id.). In 1982, the impasse was resolved "when Senator Bob Dole proposed a compromise. Section 2 would include the effects test that many desired but also a robust disclaimer against proportionality" (id. at 13 [citation omitted]).
As amended by Congress in 1982, section 2 provides that the section is violated "if, based on the totality of the circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a [racial] class of citizens . . . in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population" (52 USC § 10301[b]).
A violation of section 2 occurs "where an 'electoral structure operates to minimize or cancel out' minority voters' 'ability to elect their preferred candidates.' Such a risk is greatest 'where minority and majority voters consistently prefer different candidates' and where minority voters are submerged in a majority voting population that 'regularly defeat[s]' their choices" (Allen v Milligan, 599 US at 17-18, quoting Thornburg v Gingles, 478 US 30, 48). In interpreting section 2, the United States Supreme Court developed the Gingles test for deciding section 2 claims. The Gingles test "focuses . . . on vote dilution accomplished through cracking or packing, i.e., 'the dispersal of [a protected class of voters] into districts in which they constitute an ineffective minority of voters or from the concentration of [those voters] into districts where they constitute an excessive majority'" (Abbott v Perez, 585 US 579, 627 n 2 [Sotomoyor, J., dissenting], quoting Thornburg v Gingles, 478 US at 46 n 11).
"To succeed in proving a § 2 violation under Gingles, plaintiffs must satisfy three preconditions. First, the minority group must be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district. A district will be reasonably configured . . . if it comports with traditional districting criteria, such as being contiguous and reasonably compact. Second, the minority group must be able to show that it is politically cohesive. And third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it . . . to defeat the minority's preferred candidate. Finally, a plaintiff who demonstrates the three preconditions must also show, under the totality of the circumstances, that the political process is not equally open to minority voters" (Allen v Milligan, 599 US at 18 [citations and internal quotation marks omitted]). Factors relevant to this last determination include: "the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process; . . . the extent to which voting in the elections of the state or political subdivision is racially polarized; . . . the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group; . . . if there is a candidate slating process, whether the members of the minority group have been denied access to that process; . . . the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process; . . . whether political campaigns have been characterized by overt or subtle racial appeals; . . . the extent to which members of the minority group have been elected to public office in the jurisdiction . . . whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group[; and] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous" (Thornburg v Gingles, 478 US at 36-37 [internal quotation marks omitted]). In the 39 years that has followed Gingles, courts have required the creation of majority-minority districts all over the country (see Allen v Milligan, 599 US at 19).
In Voinovich v Quilter (507 US 146), the United States Supreme Court first considered an "influence-dilution" claim, in which the "complaint . . . is not that black voters have been deprived of the ability to constitute a majority, but of the possibility of being a sufficiently large minority to elect their candidate of choice with the assistance of cross-over voters from the white majority" (id. at 158). In doing so, the court stated that "[o]f course, the Gingles factors cannot be applied mechanically and without regard to the nature of the claim. For example, the first Gingles precondition, the requirement that the group be sufficiently large to constitute a majority in a single district, would have to be modified or eliminated when analyzing the influence-dilution claim we assume, arguendo, to be actionable today" (id.).
However, in Bartlett v Strickland (556 US 1), the United States Supreme Court reached the issue and held that section 2 could not be invoked to require the creation of such influence or crossover districts (see id. at 6). Nevertheless, the controlling opinion in Bartlett noted that "[o]ur holding that § 2 does not require crossover districts does not consider the permissibility of such districts as a matter of legislative choice or discretion" and that "[s]tates that wish to draw crossover districts are free to do so where no other prohibition exists" (id. at 23-24 [Kennedy, J.]).
Federal Circuit Courts of Appeal are split as to whether "coalition claims" are permitted under section 2 of the FVRA, where members of different races or language-minority groups claim that they are politically cohesive and that their combined voting strength would constitute a majority in a reasonably compact district (see Growe v Emison, 507 US 25, 41 [assuming without deciding that it was permissible for the District Court to combine distinct ethnic and language minority groups for purposes of assessing compliance with section 2 of the FVRA]; Petteway v Galveston County, 111 F4th 596, 599 [5th Cir] [overruling a prior decision and holding that section 2 of the FVRA does not authorize coalitions of racial and language minorities to claim vote dilution in legislative redistricting]; Clerveaux v East Ramapo Centr. Sch. Dist., 984 F3d 213, 323-233 [2d Cir] [finding that the second and third Gingles preconditions were met based on evidence "that black and Latino residents were politically cohesive and that white residents voted as a bloc"]).
Recently, the United States Supreme Court rejected arguments made by the State of Alabama that section 2 of the FVRA "as applied to redistricting is unconstitutional under the Fifteenth Amendment" and that "the Fifteenth Amendment does not authorize race-based redistricting as a remedy for § 2 violations" (Allen v Milligan, 599 US at 41). The Court explained that "we held over 40 years ago 'that, even if § 1 of the [Fifteenth] Amendment prohibits only purposeful discrimination, the prior decisions of this Court foreclose any argument that Congress may not, pursuant to § 2 [of the Fifteenth Amendment] outlaw voting practices that are discriminatory in effect,'" and that the VRA's "'ban on electoral changes that are discriminatory in effect . . . is an appropriate method of promoting the purposes of the Fifteenth Amendment'" (id., quoting City of Rome v United States, 446 US 156, 173, 177). The Court further explained that "for the last four decades, this Court and the lower federal courts have repeatedly applied the effects test of § 2 as interpreted in Gingles and, under certain circumstances, have authorized race-based redistricting as a remedy for state districting maps that violate § 2. In light of that precedent . . . , we are not persuaded by Alabama's arguments that § 2 as interpreted in Gingles exceeds the remedial authority of Congress" (id. [citations omitted]).
III. The NYVRA
In 2022, the Legislature enacted the NYVRA in order to "[e]ncourage participation in the elective franchise by all eligible voters to the maximum extent" (Election Law § 17-200[1]) and to "[e]nsure that eligible voters who are members of racial, color, and language-minority groups shall have an equal opportunity to participate in the political processes of the state of New York, and especially to exercise the elective franchise" (id. § 17-200[2]). According to the Governor's Approval Memorandum, the act "ensures that the state continues to move toward being a national leader in voting rights. As the federal government fails to fulfill its duty to uphold voting rights across the nation, it is now incumbent upon states to step-up and step-in" (Governor's Approval Mem, Bill Jacket, L 2022, ch 226 at 5). In response to Shelby County v Holder and Congress's failure to update the coverage formula, the NYVRA mandates that certain changes in voting laws in certain covered jurisdictions be precleared by the Civil Rights Bureau of the Office of the New York State Attorney General or by a designated court (see Election Law §§ 17-204[8]; 17-210). Among other things, the NYVRA also contains sections prohibiting voter suppression, intimidation, deception, and obstruction (see id. §§ 17-206[1]; 17-212).
As relevant to this action, similar to section 2 of the FVRA, and modeled after very similar laws enacted in California and Washington (see Cal Elec Code § 14025 et seq.; Wash. Rev. Code 29A.92.005 et seq.), the NYVRA contains a "[p]rohibition against vote dilution," which provides that no political subdivision "shall use any method of election, having the effect of impairing the ability of members of a protected class to elect candidates of their choice or influence [*3]the outcome of elections, as a result of vote dilution" (Election Law § 17-206[2][a])[FN2]. A "protected class" is defined as "a class of individuals who are members of a race, color, or language-minority group, including individuals who are members of a minimum reporting category that has ever been officially recognized by the United States census bureau" (id. § 17-204[5]). The NYVRA provides that a violation of the vote dilution provision "shall be established upon a showing that a political subdivision" used "an at-large method of election" and either "voting patterns of members of the protected class within the political subdivision are racially polarized,"[FN3] or "under the totality of the circumstances, the ability of members of the protected class to elect candidates of their choice or influence the outcome of elections is impaired" (id. § 17-206[2][b][i][A]-[B])[FN4]. The NYVRA also provides that a violation of the vote dilution provision "shall be established upon a showing that a political subdivision" "used a district-based or alternative method of election and that candidates or electoral choices preferred by members of the protected class would usually be defeated, and either: (A) voting patterns of members of the protected class within the political subdivision are racially [*4]polarized; or (B) under the totality of the circumstances, the ability of members of the protected class to elect candidates of their choice or influence the outcome of elections is impaired" (id. § 17-206[2][b][ii]).
"Any aggrieved person" may file an action against a political subdivision pursuant to Election Law § 17-206(4), and upon a finding of a violation of the vote dilution prohibition, a court "shall implement appropriate remedies to ensure that voters of race, color, and language-minority groups have equitable access to fully participate in the electoral process . . . , which may include (i) a district-based method of election; (ii) an alternative method of election ; (iii) new or revised districting or redistricting plans; (iv) elimination of staggered elections so that all members of the governing body are elected on the same date; [or] (v) reasonably increasing the size of the governing body" (id. § 17-206[5][a][i]-[v]). "Alternative method of election" is defined as "a method of electing members to the governing body of a political subdivision using a method other than at-large or district-based, including, but not limited to, ranked-choice voting [FN5], cumulative voting [FN6], and limited voting [FN7]" (id. § 17-204[3]). "Coalition claims [are] permitted," in that "[m]embers of different protected classes may file an action jointly pursuant to this title in the event that they demonstrate that the combined voting preferences of the multiple protected classes are polarized against the rest of the electorate" (id. § 17-206[8]).
Thus, the major differences between the vote dilution provisions of the FVRA and the NYVRA are that the NYVRA, like the California and Washington statutes, permits "influence" claims, and does not require the first Gingles precondition, i.e., that the minority group must be sufficiently large and geographically compact to constitute a majority in a reasonably configured district (see Cal Elec Code §§ 14027, 14028[c]; Wash. Rev. Code 29A.92.030[5]; Pico Neighborhood Assn. v City of Santa Monica, 15 Cal 5th 292, 316, 534 P3d 54, 65-66, 312 Cal Rptr 3d 319, 332; Portugal v Franklin County, 1 Wash 3d at 638-640, 530 P3d at 1001-1004). The NYVRA, like the California and Washington statutes, also allows for non-district based remedies, such as ranked-choice voting, cumulative voting, limited voting, and the elimination of staggered terms (see Election Law §§ 17-204[3]; 17-206[5][a][ii], [iv]; Pico Neighborhood Assn. v City of Santa Monica, 15 Cal 5th at 317, 534 P3d at 66, 312 Cal Rptr at 333; Portugal v Franklin County, 1 Wash 3d at 640, 530 P3d at 1002). While the text of Election Law § 17-206(2)(b)(i) suggests that a vote dilution claim shall be established simply upon a showing that a political subdivision used an at-large method of election and the voting patterns are racially polarized, the California Supreme Court, in interpreting a nearly identical provision, concluded that it should not be so-construed, explaining:
"In plaintiffs' view, proof of racially polarized voting, in itself, establishes 'dilution' within the meaning of the CVRA [California Voting Rights Act]. They rely on the 'plain language' of Elections Code section 14028, subdivision (a), which provides, "A violation of Section 14027 is established if it is shown that racially polarized voting occurs in elections for members of the governing body of the political subdivision . . . ." (Italics added.) According to plaintiffs, 'Section 14028 expressly states how a violation of Section 14027 is shown'—i.e., simply by demonstrating the existence of racially polarized voting in an at-large jurisdiction.
"When considered in isolation, this single sentence might arguably be susceptible to plaintiffs' reading. However, a court construing a statute does not view a fragment in isolation, but considers the statute as a whole, in context with related provisions and the overall statutory structure, so that it may best identify and effectuate the scheme's underlying purpose. As plaintiffs concede, and as the legislative history [*5]reveals, the CVRA is in many ways very similar to the VRA. When we construe 'dilution' under the CVRA, we must therefore be mindful that it is a term of art with a settled meaning under section 2 of the VRA: 'The phrase vote dilution itself suggests a norm with respect to which the fact of dilution may be ascertained.' (Holder v. Hall (1994) 512 U.S. 874, 880 [129 L. Ed. 2d 687, 114 S. Ct. 2581] (plur. opn. of Kennedy, J.).) To establish vote dilution under the VRA, 'a court must find a reasonable alternative practice as a benchmark against which to measure the existing voting practice.' (Holder, at p. 880 . . . (plur. opn. of Kennedy, J.); id. at p. 887 . . . (conc. opn. of O'Connor, J.) ['On this, there is general agreement']; id. at p. 951 . . . (dis. opn. of Blackmun, J.) ['There is widespread agreement'].) So while the existence of racially polarized voting 'is relevant to a vote dilution claim' under the VRA (Gingles, supra, 478 U.S. at p. 55)—and is indeed 'a key element' (ibid.)—it is not in itself sufficient.
"We find, for several reasons, the same is true under the CVRA. The similarities between the two schemes strongly suggest that 'dilution' requires not only a showing that racially polarized voting exists, but also that the protected class thereby has less ability to elect its preferred candidate or influence the election's outcome than it would have if the at-large system had not been adopted. . . . Although the legislative history materials can be read in different ways, one committee analysis recognized that the CVRA targets racially polarized voting in at-large elections only if it Impairs the Right of Protected Groups to elect their preferred candidates or influence the outcome of an election. After all, 'the very concept of vote dilution implies—and, indeed, necessitates—the existence of an "undiluted" practice against which the fact of dilution may be measured.' (Reno v. Bossier Parish School Bd. (1997) 520 U.S. 471, 480 [137 L. Ed. 2d 730, 117 S. Ct. 1491].)
"Plaintiffs' construction would allow a party to prevail based solely on proof of racially polarized voting that could not be remedied or ameliorated by any other electoral system. Moreover, such a construction would render the word 'dilution' in Elections Code section 14027 surplusage. Accordingly, we agree with the Court of Appeal that dilution is a separate element under the CVRA. To establish the dilution element, a plaintiff in a CVRA action must identify a reasonable alternative voting practice to the existing at-large electoral system that will 'serve as the benchmark "undiluted" voting practice.' (Reno v. Bossier Parish School Bd., supra, 520 U.S. at p. 480)" (Pico Neighborhood Assn. v City of Santa Monica, 15 Cal 5th at 314-315, 534 P3d at 64-65, 312 Cal Rptr 3d at 330-331 [citations and internal quotation marks omitted]).
The plaintiffs in this case interpret the NYVRA as similarly requiring plaintiffs to demonstrate a reasonable alternative practice before obtaining relief.
IV. This Action
The Town of Newburgh is a political subdivision in Orange County with a population of about 32,000. The Town Board is the Town's legislative and policy-making authority, and the five members of the Town Board [FN8] are chosen through at-large elections, meaning that every registered voter residing within the Town is eligible to vote for each Town Board member position. In March 2024, the plaintiffs commenced this action against the Town and the Town Board alleging vote dilution in violation of Election Law § 17-206 and seeking a judgment ordering the implementation of a new method of election for the Town Board that includes either a districting plan or an alternative method of election. The complaint alleges that Black and Hispanic communities comprise approximately 25 percent and 15 percent, respectively, of the Town's population, yet every person ever elected to the Town Board has been white. The defendants moved for summary judgment dismissing the complaint, arguing that the NYVRA's vote dilution provisions violate the Equal Protection Clauses of the Fourteenth Amendment to the United States Constitution and the New York Constitution or, in the alternative, that the Town's at-large voting system [*6]complied with the NYVRA . In opposition, the plaintiff contended, inter alia, that the defendants lacked the capacity to challenge the constitutionality of the NYVRA.
The Supreme Court granted the defendants' motion, concluding that the NYVRA was facially unconstitutional in violation of the Equal Protection Clause of the Fourteenth Amendment. The court also directed that the NYVRA was "stricken in its entirety from further enforcement and application to these Defendants and to any other political subdivision in the State of New York." The plaintiffs appeal. The Attorney General of the State of New York (hereinafter the AG) has also intervened as an appellant (see Executive Law § 71; 22 NYCRR 1250.9[i]).
V. Capacity
The plaintiffs and the AG contend that the defendants lack the capacity to challenge the constitutionality of the NYVRA's vote dilution provisions.
"Capacity 'concerns a litigant's power to appear and bring its grievance before the court'" (Matter of World Trade Ctr. Lower Manhattan Disaster Site Litig., 30 NY3d 377, 384, quoting Community Bd. 7 of Borough of Manhattan v Schaffer, 84 NY2d 148, 155). "[T]he traditional principle throughout the United States has been that municipalities and other local governmental corporate entities and their officers lack capacity to mount constitutional challenges to acts of the State and State legislation. . . . Constitutionally as well as a matter of historical fact, municipal corporate bodies . . . are merely subdivisions of the State, created by the State for the convenient carrying out of the State's governmental powers and responsibilities as its agents. Viewed, therefore, by the courts as purely creatures or agents of the State, it follow[s] that municipal corporate bodies cannot have the right to contest the actions of their principal or creator affecting them in their governmental capacity or as representatives of their inhabitants" (City of New York v State of New York, 86 NY2d 286, 289-290). This rule has been applied to municipal entities raising a constitutional challenge in defense of a lawsuit (see Matter of World Trade Ctr. Lower Manhattan Disaster Site Litig., 30 NY3d at 393; In re World Trade Center Lower Manhattan Disaster Site Litigation, 892 F3d 108, 109-111 [2d Cir]).
However, as the Court of Appeals has stated, "[t]he capacity rule is not absolute. . . . [T]he assertion of some constitutional rights may, by their nature, present special circumstances to which the general rule must yield. To date, we have identified a limited number of situations presenting such special circumstances, such as . . . where a public entity asserts that if it is obligated to comply with a statute it 'will by that very compliance be forced to violate a constitutional proscription'" (Matter of World Trade Ctr. Lower Manhattan Disaster Site Litig., 30 NY3d at 386, quoting City of New York v State of New York, 86 NY2d at 292 [citations and internal quotation marks omitted]). "[T]he exceptions we have recognized to date are narrow. Under the general rule, we have barred public entities from challenging a wide variety of state actions, such as, e.g., the allocation of state funds amongst various localities, the modification of a village-operated hospital's operating certificate, the closure of a local jail by the State, special exemptions from local real estate tax assessments, state land use regulations, and state laws requiring electric voting systems to be installed at polling places in lieu of lever-operated machines" (id. at 387 [citations omitted]).
The only exception to the general rule that the defendants invoke is for circumstances where a municipality's compliance with a state statute would force it to violate a constitutional proscription. Accordingly, to succeed on their constitutional argument, the defendants must establish that compliance with the NYVRA would force them to violate the Equal Protection Clause (see Board of Educ. of Mt. Sinai Union Free Sch. Dist. v New York State Teachers Retirement Sys., 60 F3d 106, 112 [2d Cir]; Blakeman v James, 2024 WL 3201671, *14, 2024 US Dist LEXIS 115441, *36-38 [ED NY, No. 2:24-cv-1655 (NJC) (LGD)]; Merola v Cuomo, 427 F Supp 3d 286, 293 [ND NY]). For the reasons discussed below, it cannot be said as a matter of law on this record that compliance with the NYVRA would force the defendants to violate the Equal Protection Clause.
VI. The Equal Protection Clause
"A statute enjoy[s] a strong presumption of constitutionality. To rebut that presumption, the party attempting to strike down a statute as facially unconstitutional bears the heavy burden of proving beyond a reasonable doubt that the statute is in conflict with the Constitution" (People v Viviani, 36 NY3d 564, 576 [citations and internal quotation marks omitted]). Courts strike statutes down "only as a last unavoidable result after every reasonable mode of reconciliation of the statute with the Constitution has been resorted to, and reconciliation has been found impossible" (White v Cuomo, 38 NY3d 209, 216 [citation and internal quotation marks omitted]). A party making a facial challenge must "demonstrate that 'in any degree and in every conceivable [*7]application,' the law suffers wholesale constitutional impairment" (Cohen v State of New York, 94 NY2d 1, 8, quoting McGowan v Burstein, 71 NY2d 729, 733). "A successful facial challenge means that the law is 'invalid in toto——and therefore incapable of any valid application'" (People v Stuart, 100 NY2d 412, 421, quoting Hoffman Estates v Flipside, Hoffman Estates, Inc., 455 US 489, 494 n 5). "Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of premature interpretation of statutes on the basis of factually barebones records. Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied. Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. [Courts] must keep in mind that [a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people" (Washington State Grange v Washington State Republican Party, 552 US 442, 450-451 [citations and internal quotation marks omitted]).
While Congress has the authority to enact anti-discrimination laws under section 5 of the Fourteenth Amendment of the United States Constitution and section 2 of the Fifteenth Amendment of the United States Constitution, the New York State Legislature has the authority to enact statutes that protect against racial discrimination pursuant to its general police power (see Executive Law § 290[2]; Roberts v United States Jaycees, 468 US 609, 624; Matter of Holland v Edwards, 282 App Div 353, 357, affd 307 NY 38), and has "'broad powers to determine the conditions under which the right of suffrage may be exercised'" (Shelby County v Holder, 570 US at 543, quoting Carrington v Rash, 380 US 89, 91). However, in exercising that authority, the New York State Legislature must comply with the Equal Protection Clause of the Fourteenth Amendment.
The Fourteenth Amendment provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws" (US Const, 14th Amend, § 1). "Alleged equal protection violations are primarily evaluated using either a 'strict scrutiny' or 'rational basis' standard of review" (People v Aviles, 28 NY3d at 502). "It is well established that when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny" (Parents Involved in Community Schools v Seattle School Dist. No. 1, 551 US 701, 720). "'[A]ll racial classifications [imposed by government] . . . must be analyzed by a reviewing court under strict scrutiny'" (Johnson v California, 543 US 499, 505, quoting Adarand Constructors, Inc. v Pen a, 515 US 200, 227). "'[R]acial classifications receive close scrutiny even when they may be said to burden or benefit the races equally'" (Johnson v California, 543 US at 506, quoting Shaw v Reno, 509 US 630, 651; see Brown v Board of Education, 347 US 483). The United States Supreme Court has "insisted on strict scrutiny in every context, even for so-called benign racial classifications, such as race-conscious university admissions policies, race-based preferences in governmental contracts, and race-based districting intended to improve minority representation" (Johnson v California, 543 US at 505 [citations and internal quotation marks omitted]).
Strict scrutiny "ask[s], first, whether the racial classification is used to further compelling governmental interests" and "[s]econd, . . . whether the government's use of race is narrowly tailored —meaning necessary— to achieve that interest" (Students for Fair Admissions, Inc. v President and Fellows of Harvard College, 600 US 181, 206-207 [citation and internal quotation marks omitted]). If there is no basis for imposing a heightened level of scrutiny, "then the provision may be sustained if there is a rational basis for its enactment," meaning that the governmental action must be "rationally related to [a] legitimate State interest" (Golden v Clark, 76 NY2d 618, 624).
Here, the defendants contend that any change of its at-large electoral system to comply with the NYVRA would violate the Equal Protection Clause because it would be done with the express purpose of giving citizens statutorily grouped together by race greater electoral success than its at-large system, and that the NYVRA, unlike the FVRA, is not narrowly tailored to achieve a compelling governmental interest.
Initially, we agree with the plaintiffs and the AG that strict scrutiny does not apply to all applications of the vote dilution provisions of the NYVRA. The statute gives rights to "members of a race, color, or language-minority group" (Election Law § 17-204[5]; see id. § 17-206[2]) in order to "ensure that voters of race, color, and language-minority groups have equitable [*8]access to fully participate in the electoral process" (id. § 17-206[5][a]). "[I]t is familiar law that a statute should be construed so as to avoid doubts concerning its constitutionality" (Matter of Lorie C., 49 NY2d 161, 171). Bearing this maxim in mind, we agree with the plaintiffs and the AG that the statute should be construed as allowing members of all racial groups, including white voters, to bring vote dilution claims, including when white voters constitute a minority in a political subdivision, as is the case in certain jurisdictions in New York (see Portugal v Franklin County, 1 Wash 3d at 648, 530 P3d at 1006 [stating that the Washington Voting Rights Act, which similarly allows "voters who are members of a race, color, or language minority group in the state of Washington, as this class is referenced and defined in the [FVRA]" (Wash. Rev. Code § 29A.92.010[6]) to bring vote dilution claims, "on its face, . . . requires equal opportunit[ies] for voters of all races, colors, and language minority groups" (internal quotation marks omitted)]; Sanchez v City of Modesto, 145 Cal App 4th 660, 666, 51 Cal Rptr 3d 821, 826 [stating that the CVRA, which similarly allows "voters who are members of a race, color, or language minority group, as this class is referenced and defined in the federal Voting Rights Act of 1965" (Cal Elec Code § 14026[d]) to bring vote dilution claims, "gives a cause of action to members of any racial or ethnic group that can establish that its members' votes are diluted through the combination of racially polarized voting and an at-large election system" and that "any racial group can experience the kind of vote dilution the CVRA was designed to combat, including Whites. Just as non-Whites in majority-White cities may have a cause of action under the CVRA, so may Whites in majority-non-White Cities. Both demographic situations exist in California . . ., and the CVRA applies to each in exactly the same way"]; see also United States v Brown, 494 F Supp 2d 440, 444 [SD Miss] ["Section 2 [of the FVRA] provides no less protection to white voters than any other class of voters"], affd 561 F3d 420 [5th Cir]).
In upholding the California and Washington vote dilution statutes, courts have held that they were neither subject to strict scrutiny nor facially in violation of the Equal Protection Clause. In Sanchez v City of Modesto (145 Cal App 4th at 666, 51 Cal Rptr 3d at 826), the California Court of Appeal for the Fifth Appellate District explained: "The CVRA is race neutral. It does not favor any race over others or allocate burdens or benefits to any groups on the basis of race. It simply gives a cause of action to members of any racial or ethnic group that can establish that its members' votes are diluted through the combination of racially polarized voting and an at-large election system . . . . In this respect, it is similar to other long-standing statutes that create causes of action for racial discrimination, such as the federal Civil Rights Act or California's Fair Employment and Housing Act." The court further noted that the defendants' argument "collapses as soon as it is applied to the FVRA. . . . [S]ection 2 of the FVRA does not require a showing of intentional discrimination. No court has ever suggested, to our knowledge, that strict scrutiny applies to section 2 of the FVRA and that it would fail for this reason" (Sanchez 145 Cal App 4th at 682, 51 Cal Rptr 3d at 839). Similarly, in Higginson v Becerra (786 Fed Appx 705), the United States Court of Appeals for the Ninth Circuit affirmed the dismissal of a complaint brought by a resident of the City of Poway who alleged that he resided in a racially gerrymandered electoral district because of the CVRA, explaining that the complaint "does not allege that the City or the CVRA distribute[d] burdens or benefits on the basis of individual racial classifications. Although a finding of racially polarized voting triggers the application of the CVRA, it is well settled that governments may adopt measures designed 'to eliminate racial disparities through race-neutral means'" (id. at 706-707, quoting Texas Dept. of Housing and Comunity Affairs v Inclusive Communities Project, Inc., 576 US 519, 545 [citation and internal quotation marks omitted]). The United States Supreme Court denied certiorari (see Higginson v Becerra, 140 S Ct 2807). Finally, in Portugal v Franklin County (Wash 3d at 658, 530 P3d at 1011), the Supreme Court of Washington held that the Washington Voting Rights Act (hereinafter WVRA) "on its face does not classify voters on the basis of race, nor does it deprive anyone of the fundamental right to vote. Instead, the WVRA mandates equal voting opportunities for members of every race, color, and language minority group," thus triggering rational basis review and not strict scrutiny (see Coads v Nassau County, __ Misc 3d __, 2024 NY Slip Op 24314 [Sup Ct, Nassau County] [concluding that the vote dilution provisions of the NYVRA do not facially violate the Equal Protection Clause]). It is true that "[u]nder the Equal Protection Clause, districting maps that sort voters on the basis of race are by their very nature odious" and "cannot be upheld unless they are narrowly tailored to achieving a compelling state interest" (Wisconsin Legislature v Wisconsin Elections Comm'n, 595 US 398, 401 [internal quotation marks omitted]). "'Racial gerrymandering, even for [*9]remedial purposes, may balkanize us into competing racial factions; it threatens to carry us further from the goal of a political system in which race no longer matters—a goal that the Fourteenth and Fifteenth Amendments embody, and to which the Nation continues to aspire'" (Bartlett v Strickland, 556 US at 21, quoting Shaw v Reno, 509 US at 657). "When the State assigns voters on the basis of race, it engages in the offensive and demeaning assumption that voters of a particular race, because of their race, 'think alike, share the same political interests, and will prefer the same candidates at the polls'" (Miller v Johnson, 515 US 900, 911-912, quoting Shaw v Reno, 509 US at 647). "The message that such districting sends to elected representatives is equally pernicious. When a district obviously is created solely to effectuate the perceived common interests of one racial group, elected officials are more likely to believe that their primary obligation is to represent only the members of that group, rather than their constituency as a whole" (Shaw v Reno, 509 US at 648). The United States Supreme Court has "assumed" that complying with section 2 of the FVRA is a compelling interest, but also held that "when a State invokes § 2 to justify race-based districting, 'it must show (to meet the narrow tailoring requirement) that it had a strong basis in evidence for concluding that the statute required its action'" (Wisconsin Legislature v Wisconsin Elections Comm'n, 595 US at 402 [internal quotation marks omitted], quoting Cooper v Harris, 581 US 285, 292; see Bush v Vera, 517 US 952, 979-982; Shaw v Hunt, 517 US 899, 908-918; Miller v Johnson, 515 US at 921).
However, race-based districting is only one of the possible remedies under the NYVRA; the NYVRA also contemplates remedies that do not sort voters based on race, such as ranked-choice voting, cumulative voting, limited voting, and the elimination of staggered terms (see Election Law §§ 17-204[3]; 17-206[5][a][ii],[iv]; Collins v City of Norfolk, Va., 883 F2d 1232, 1236 [4th Cir] [noting that the potential for vote dilution in an at-large system "may be enhanced by staggered terms"]; Theodore S. Arrington & Gerald L. Ingalls, The limited vote alternative to affirmative districting, 17 Political Geography 6, 701-728 [August 1998] [presenting evidence that the number of minority candidates and their chance of winning increased when limited voting replaced simple at-large systems]). Even if a district-based system is used as a remedy, strict scrutiny would only apply if race is the "'predominant factor in drawing district lines'" (Allen v Milligan, 599 US at 31 [Opinion of Roberts, C.J., joined by Justices Sotomayor, Kagan, and Jackson] [concluding that a remedial map drawn to remedy a violation of section 2 of the FVRA was not subject to strict scrutiny because the plaintiffs' expert mapmaker testified that although race was a consideration, it did not predominate over other factors in drawing district lines], quoting Cooper v Harris, 581 US at 291; see Bethune-Hill v Virginia State Bd. of Elections, 580 US 178, 189-190 [race may predominate even when a reapportionment plan respects traditional districting principles if race-neutral considerations came into play only after the race-based decision had been made, or if race for its own sake is the overriding reason for choosing one map over others]; Miller v Johnson, 515 US at 916 [although redistricting legislatures will almost always be aware of racial demographics, it does not follow from that that race predominates in the redistricting process]; Pico Neighborhood Assn. v City of Santa Monica, 15 Cal 5th at 323, 534 P3d at 70, 312 Cal Rptr 3d at 337 [rejecting a contention that a majority-minority requirement—or something close to it in the form of a near-majority requirement—was necessary to avoid difficult constitutional questions under the Equal Protection Clause, and noting that "nothing in the CVRA requires a municipality or a court to select a district-based remedy or, even if it chooses to do so, to draw district lines, as the City contends, based 'principally on race'" rather than other statutorily-prescribed redistricting factors]).
As the California Court of Appeal for the Fifth Appellate District explained in rejecting a facial challenge to the CVRA: "The city may . . . use similar arguments to attempt to show as-applied invalidity later if liability is proven and a specific application or remedy is considered that warrants the attempt. For example, if the court entertains a remedy that uses race, such as a district-based election system in which race is a factor in establishing district boundaries, defendants may again assert the meaty constitutional issues they have raised here. In doing so, at that time they can ask the court to decide whether the particular application or remedy is discriminatory" (Sanchez v City of Modesto, 145 Cal App 4th at 665, 51 Cal Rptr 3d at 825-826). The State of Washington's highest court has made a similar determination (see Portugal v Franklin County, 1 Wash 3d at 659, 530 P3d at 1012 ["Without a doubt, the WVRA could be applied in an unconstitutional manner, and it is subject to as-applied challenges. However, . . . the WVRA, on its face, does not require unconstitutional actions"]).
Further, we conclude that the NYVRA need not contain the first Gingles [*10]precondition, that the "minority group . . . be sufficiently large and [geographically] compact to constitute a majority in a reasonably configured district" (Allen v Milligan, 599 US at 18 [internal quotation marks omitted]), to survive a facial challenge to its constitutionality under the Equal Protection Clause. The United States Supreme Court has never said that the Gingles test was required by the constitution, as opposed to resulting from a statutory interpretation of section 2 of the FVRA (see Portugal v Franklin County, 1 Wash 3d at 659, 530 P3d at 1011-1012). The only time the Fourteenth Amendment is mentioned in the majority opinion in Gingles is in the background section where the court noted that the plaintiffs' lawsuit challenged the subject districts as violating the Fourteenth and Fifteenth Amendments in addition to violating section 2 of the FVRA (see Thornburg v Gingles, 478 US at 35). The reason that the United States Supreme Court included the first Gingles precondition was because of its conclusion that if the minority group were unable to demonstrate that it was sufficiently large and geographically compact to constitute a majority in a single-member district, "the multi-member form of the district [could not] be responsible for minority voters' inability to elect its candidates" (id. at 50). Gingles was not contemplating influence districts or remedies such as ranked-choice voting, cumulative voting, limited voting, or the elimination of staggered terms. As the United States Supreme Court noted in Voinovich v Quilter (507 US at 158),"[o]f course, the Gingles factors cannot be applied mechanically and without regard to the nature of the claim." Since the NYVRA specifically allows for remedies that might allow for minorities to elect their candidates of choice or influence the outcome of elections without their constituting a majority in a single-member district, it was rational for the New York Legislature to not include the first Gingles precondition as a precondition to liability under the NYVRA (see Portugal v Franklin County, 1 Wash 3d at 640-641, 530 P3d at 1003 ["Because the WVRA contemplates a broader range of remedies than Section 2, a WVRA plaintiff can state a redressable injury under a broader range of circumstances than a Section 2 plaintiff."]; Pico Neighborhood Assn. v City of Santa Monica, 15 Cal 5th at 317, 534 P3d at 66, 312 Cal Rptr 3d at 332 ["It would make little sense to require CVRA plaintiffs to show that the protected class could constitute a majority of a hypothetical district, given that the CVRA is not limited to ability-to-elect claims nor are its remedies limited to district elections."]; Sanchez v City of Modesto, 145 Cal App 4th at 670, 51 Cal Rptr 3d at 829).
Further, while the text of the NYVRA is unlike the FVRA in that it does not require the plaintiff in every vote dilution case to show that "under the 'totality of the circumstances,'. . . the political process is not 'equally open' to minority voters" (Allen v Milligan, 599 US at 18, quoting Thornburg v Gingles, 478 US at 45-46; see 52 USC § 10301), in order to obtain a remedy under the NYVRA, a plaintiff still must show that "vote dilution" has occurred (Election Law § 17-206[2][a]), and that there is an alternative practice that would allow the minority group to "have equitable access to fully participate in the electoral process" (id. § 17-206[5][a]; see Pico Neighborhood Assn. v City of Santa Monica, 15 Cal 5th at 314-315, 534 P3d at 64-65, 312 Cal Rptr 3d at 330-331). Thus, the NYVRA does not significantly differ from the FVRA in this respect.
Finally, even if it were unconstitutional to apply the NYVRA in situations where the Gingles test has not been satisfied, the NYVRA could still be constitutionally applied in situations where the Gingles test has been satisfied. All parties agree that the FVRA as interpreted by Gingles is constitutional (see Allen v Milligan, 599 US at 41). Here, the plaintiffs contend that the evidence they submitted in opposition to the defendants' motion demonstrates that each element of the Gingles test has been satisfied.
Accordingly, the defendants failed to establish as a matter of law that compliance with the vote dilution provisions of the NYVRA would force them to violate the Equal Protection Clause.
VII. The Provisions of the NYVRA Other Than the Vote Dilution Provisions
Although the parties in this case only made arguments regarding the vote dilution provisions of the NYVRA, the Supreme Court's order directed that the NYVRA was "stricken in its entirety from further enforcement and application to these Defendants and to any other political subdivision in the State of New York." As noted above, the NYVRA contains other provisions, not at issue in this action, mandating preclearance of certain changes in voting laws and prohibiting voter suppression, intimidation, deception, and obstruction (see Election Law §§ 17-206[1]; 17-210; 17-212). The NYVRA also contains a severability clause stating that "[i]f any provision of this title or its application to any person, political subdivision, or circumstance is held invalid, the invalidity shall not affect other provisions or applications of this title which can be given effect without the invalid provision or application" (id. § 17-222; see Town of Islip v Caviglia, 141 AD2d 148, 167-[*11]168). As the defendants do not dispute, even if the vote dilution provisions of the NYVRA did violate the Equal Protection Clause, the Supreme Court had no authority to invalidate the remaining portions of the NYVRA (see T.D. New York State Off. of Mental Health, 91 NY2d 860, 862; Matter of Hearst Corp. v Clyne, 50 NY2d 707, 713). The Supreme Court also had no authority to bind entities that are not parties to this action or to bind courts in other judicial districts deciding actions brought pursuant to the NYVRA (see D'Alessandro v Carro, 123 AD3d 1, 6; Riverside Capital Advisors, Inc. v First Secured Capital Corp., 28 AD3d 457, 460).
VIII. The Defendants' Alternative Ground for Summary Judgment
In the Supreme Court, the defendants alternatively argued that they were entitled to summary judgment on the ground that the Town's at-large voting system complied with the NYVRA. However, on appeal, the defendants do not mention this argument or advance it 
as an alternative ground for affirmance (cf. Parochial Bus Sys. v Board of Educ. of City of N.Y., 60 NY2d 539, 545-546; Olden Group, LLC v 2890 Review Equity, LLC, 209 AD3d 748, 750).
IX. Conclusion
Accordingly, the order is reversed, on the law, and the defendants' motion for summary judgment dismissing the complaint is denied.
CHAMBERS, TAYLOR and GOLIA, JJ., concur.
ORDERED that the order is reversed, on the law, with one bill of costs payable by the defendants to the plaintiffs, and the defendants' motion for summary judgment dismissing the complaint is denied.
ENTER:
Darrell M. Joseph
Clerk of the Court

Footnotes

Footnote 1: The defendants contend that the NYVRA also violates the New York State Constitution, which the Court of Appeals has stated "provides for equivalent equal protection safeguards" (People v Aviles, 28 NY3d 497, 502; see NY Const, art I, § 11). As the parties do not contend that equal protection claims under the New York State Constitution should be analyzed differently than the equal protection claims under the Fourteenth Amendment, the equal protection claim set forth by the defendants will be analyzed with reference to the Fourteenth Amendment, bearing in mind that the rationale would also be dispositive of the defendants' equal protection claim under the New York State Constitution. 

Footnote 2: For the purposes of demonstrating that vote dilution has occurred, the NYVRA provides that "evidence shall be weighed and considered as follows: (i) elections conducted prior to the filing of an action pursuant to this subdivision are more probative than elections conducted after the filing of the action; (ii) evidence concerning elections for members of the governing body of the political subdivision are more probative than evidence concerning other elections; (iii) statistical evidence is more probative than non-statistical evidence; (iv) where there is evidence that more than one protected class of eligible voters are politically cohesive in the political subdivision, members of each of those protected classes may be combined; (v) evidence concerning the intent on the part of the voters, elected officials, or the political subdivision to discriminate against a protected class is not required; (vi) evidence that voting patterns and election outcomes could be explained by factors other than racially polarized voting, including but not limited to partisanship, shall not be considered; (vii) evidence that sub-groups within a protected class have different voting patterns shall not be considered; (viii) evidence concerning whether members of a protected class are geographically compact or concentrated shall not be considered, but may be a factor in determining an appropriate remedy; and (ix) evidence concerning projected changes in population or demographics shall not be considered, but may be a factor, in determining an appropriate remedy" (Election Law § 206[2][c]).

Footnote 3: "Racially polarized voting" is defined as "voting in which there is a divergence in the candidate, political preferences, or electoral choice of members in a protected class from the candidates, or electoral choice of the rest of the electorate" (Election Law § 17-204[6]).

Footnote 4: In making a "totality of the circumstances" determination, "factors that may be considered shall include, but not be limited to: (a) the history of discrimination in or affecting the political subdivision; (b) the extent to which members of the protected class have been elected to office in the political subdivision; (c) the use of any voting qualification, prerequisite to voting, law, ordinance, standard, practice, procedure, regulation, or policy that may enhance the dilutive effects of the election scheme; (d) denying eligible voters or candidates who are members of the protected class to processes determining which groups of candidates receive access to the ballot, financial support, or other support in a given election; (e) the extent to which members of the protected class contribute to political campaigns at lower rates; (f) the extent to which members of a protected class in the state or political subdivision vote at lower rates than other members of the electorate; (g) the extent to which members of the protected class are disadvantaged in areas including but not limited to education, employment, health, criminal justice, housing, land use, or environmental protection; (h) the extent to which members of the protected class are disadvantaged in other areas which may hinder their ability to participate effectively in the political process; (i) the use of overt or subtle racial appeals in political campaigns; (j) a significant lack of responsiveness on the part of elected officials to the particularized needs of members of the protected class; and (k) whether the political subdivision has a compelling policy justification that is substantiated and supported by evidence for adopting or maintaining the method of election or the voting qualification, prerequisite to voting, law, ordinance, standard, practice, procedure, regulation, or policy. Nothing in this subdivision shall preclude any additional factors from being considered, nor shall any specified number of factors be required in establishing that such a violation has occurred" (id. § 17-206[3]).

Footnote 5: Ranked-choice voting is "where a voter ranks candidates in order of preference, and votes are transferred to lower-ranked candidates who are not elected on first-place votes if a majority is not reached" (Portugal v Franklin County, 1 Wash 3d 629, 640, 530 P3d 994, 1002). 

Footnote 6: Cumulative voting is "where a voter receives as many votes as there are candidates to elect, but may cast multiple votes for a single candidate" (id.).

Footnote 7: Limited voting is "where a voter receives fewer votes than there are candidates to elect" (id.).

Footnote 8: The Town Board consists of a Town Supervisor and four other members.